EXHIBIT "C-1"

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

Page 1

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

In re:                    : Bankruptcy No.
                          :
KAMURAN CORTUCK,          : 17-34019-CMG
                          :
     Debtor.              :


------------

Monday, April 30, 2018

------------


        341(a) Hearing, taken at the Clarkson S.
Fisher Federal Building and United States
Courthouse, 502 East State Street, First Floor, 341
Hearing Room, Trenton, New Jersey, on the above
date, commencing at 10:08 a.m., there being present:


        UNITE STATES DEPARTMENT OF JUSTICE
        OFFICE OF THE UNITED STATES TRUSTEE
        One Newark Center
        Suite 2100
        Newark, New Jersey  07102
        BUNCE D. ATKINSON, ESQUIRE
        Panel Trustee
        AND
        MICHAEL A. ARTIS, ESQUIRE


        - - - - - -


        TATE & TATE
     Certified Court Reporters
     520 Stokes Road, Suite C-1
        The Ironstone Village
     Medford, New Jersey  08055
     (856) 983-8484 - (800) 636-9283
        www.tate-tate.com

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

## Page 2

A P P E A R A N C E S :

GIORDANO, HALLERAN & CIESLA, P.C.
125 Half Mile Road
Suite 300
Red Bank, New Jersey 07701-6777
BY:  DONALD F. CAMPBELL, JR., ESQUIRE
Attorneys for the Debtor

SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY
308 Harper Drive
Suite 200
Moorestown, New Jersey 08057
BY:  ARTHUR J. ABRAMOWITZ, ESQUIRE
AND
SEQUOR LAW
1001 Brickell Bay Drive
9th Floor
Miami, Florida 33131
BY:  GREGORY S. GROSSMAN, ESQUIRE
Attorneys for Banco Turco Romana Bank

## Page 3

I N D E X

WITNESS                                    PAGE
KAMURAN CORTUK
      EXAMINATION BY MR. BAKER.................4

E X H I B I T S

EXHIBIT                                    PAGE
      (NONE MARKED.)

## Page 4

MR. ATKINSON:  Good morning, ladies and gentlemen.  My name is Bunce Atkinson.  And I'm the trustee for the first meeting of creditors being conducted today for Kamuran Cortuk, Case Number 17-34019 CMG.  This petition was originally filed on November 29, 2017.

The first meeting of creditors was conducted on January 22, 2018 or it started I should say.  It only lasted for about five minutes because it was my regular Chapter 7 day and you have six or seven cases every half hour and obviously, we couldn't do this one.

At the previous first meeting of creditors, because it couldn't be done completely, I continued the first meeting of creditors and it is now being conducted here today in Trenton, April 30, 2018.

I've already seen the identification of Mr. Cortuk, so I'm not going to make him produce his driver's license and proof of his Social Security number again, but I will reswear him.

KAMURAN CORTUK, having been duly sworn, was examined and testified as follows:
EXAMINATION BY MR. ATKINSON:
Q.    Mr. Cortuk, you filed a petition for leave under Chapter 7 of the United States Bankruptcy code

## Page 5

on November 29, 2017, correct?
A.    Yes.
Q.    And prior to filing the petition in bankruptcy, did you review the petition?
A.    No.  I think we had something more.
Q.    No.  I'm talking -- I'm going back to November 29 --
A.    Yeah.
Q.    -- 2017?
A.    Yeah, yeah.
Q.    The petition in bankruptcy --
A.    Yeah.
Q.    -- was filed on your behalf --
A.    Yeah.
Q.    -- by Mr. Campbell's office?
A.    Yes.
Q.    Did you review the petition before?
A.    Yeah, I signed it and I read it.
Q.    Okay.  And at the time, was the information, the document that you filed on November 29, 2017, was the information in that correct?
A.    Correct, yes.
Q.    Okay.  Subsequently, you filed an amendment to the petition; is that correct?
A.    Yes.

(856) 983-8484                    Tate & Tate, Inc.                    (800) 636-8283
520 Stokes Road, Suite C-1, Medford, NJ  08055

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

---

Page 6

1  Q.   Okay.  And that amendment was filed last
2  Friday, which I believe was April 27th --
3  A.   Yes, Friday.
4  Q.   -- 2018, correct?
5       And did you review the amendments before
6  they were filed?
7  A.   Yes, I did.
8  Q.   And was the information in the amendments
9  correct?
10 A.   True, yes.
11 Q.   Okay.  Now, I'm going to ask Mr. Campbell
12 to show you your original filing, which was a
13 Voluntary Petition for Individuals Filing for
14 Bankruptcy and I'm going to call your attention to
15 the sixth page.
16      MR. CAMPBELL:  Which is what, the
17 state petition?
18      MR. ATKINSON:  No, it's the Voluntary
19 Petition, the one that was filed on November 27th.
20      MR. CAMPBELL:  Yep.  This one.
21 BY MR. ATKINSON:
22 Q.   And is that your signature?
23 A.   Yes, that's mine, yes.
24 Q.   Okay.  And you knew you were swearing under
25 oath that the information contained in the petition

---

Page 7

1  was true, correct?
2  A.   Yes, correct.
3  Q.   Okay.  And then subsequently, you filed
4  some additional documents, including the Statement
5  of Financial Affairs for Individuals Filing for
6  Bankruptcy and I believe that was filed -- oh,
7  that's the amendment.  Excuse me.
8       You filed a document in January to finish
9  your filings.  The first page of it was official
10 form 106 S, summary of your assets and liabilities?
11 A.   Yes.
12 Q.   The second form was Schedules A/B:
13 Property.  The third was Schedule C, Form 106C.  The
14 fourth was Schedule D, Form 106D.  The next was
15 official Form 106, Schedule E/F.  Next was Schedule
16 G: Executory Contracts and Unexpired Leases.
17 A.   Yes.
18 Q.   Next was Schedule H, your co-debtors.  The
19 next was schedule I, your income.
20 A.   Yep.
21 Q.   The next was Schedule J, your expenses.
22 A.   Yes.
23 Q.   The next was Declaration About Individual
24 Debtor's Schedules and there's a signature there?
25      MR. CAMPBELL:  I don't seem to have an

---

Page 8

1  original right here.  We should.  I don't know why
2  we don't.
3       MR. ARTIS:  And just for the record
4  that was filed on December 18th, Bunce.
5       MR. ATKINSON:  Okay.  Thank you.
6       MR. CAMPBELL:  Yes.
7  BY MR. ATKINSON:
8  Q.   Did you sign that?
9  A.   Yeah.
10      MR. CAMPBELL:  Do you remember signing
11 this?
12 Q.   Okay.  And that's not a signed copy?
13      MR. CAMPBELL:  No, we must have the
14 signed copy.
15      MR. ATKINSON:  Okay.  I'm going to ask
16 you to send me the signed copy.
17      MR. CAMPBELL:  Sure.
18 BY MR. ATKINSON:
19 Q.   And was the information contained in the
20 petition true, all these schedules?
21 A.   Yes, yeah.
22 Q.   Other than any changes you made with the
23 amendment on April 27, 2018, is the information
24 contained in all of the schedules true?
25 A.   True, yes.

---

Page 9

1  Q.   Okay.  Then the next form was official Form
2  107, Statement of Financial Affairs for Individuals
3  for Filing Bankruptcy.
4       Take that piece of paper here and write
5  down things that I ask for so that I know what I've
6  asked for.
7       And I'm going to call your attention to the
8  first -- the one, two -- the ninth page, I'm sorry,
9  it's the seventh page, and I note that Mr. Campbell
10 does not have your signed document there.  Did you
11 sign the Statement of Financial Affairs?
12 A.   Yes.
13 Q.   Did you review it before you signed it?
14 A.   Yes.
15 Q.   Was all of the information contained in it
16 true?
17 A.   True.
18 Q.   And then the next page is a Verification of
19 Creditor Matrix and a copy that Mr. Campbell is
20 showing you is not signed.  Did you sign it?
21 A.   Yes.
22 Q.   And was the information contained in it
23 true?
24 A.   Yeah, it's true.
25 Q.   Okay.  Now, I note that just in the

---

3 (Pages 6 to 9)

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

## Page 10

1  Verification of Creditor -- we'll get back to that.
2  Now, on April 27th, 2000 -- do you have it?
3  Which ones do you have?
4  MR. CAMPBELL:  I've got them all.
5  MR. ATKINSON:  Okay. Could you just
6  show him the signature?
7  BY MR. ATKINSON:
8  Q.  First we're going to show you the Voluntary
9  Petition for Individual Filing with your signature
10  and that's your signature, correct?
11  A.  My signature, correct, yes.
12  Q.  Okay. And you've read -- you read it
13  before signing it?
14  A.  Yes, I did.
15  Q.  Okay. And where was it -- where did you
16  sign it?
17  A.  In his office.
18  Q.  Okay. And the next item is a Declaration
19  About Individual Debtor Schedules.  It appears to be
20  signed.  Is that your signature?
21  A.  My signature.
22  Q.  And did you read it?
23  A.  Yes, I read it.
24  Q.  And then the next item is statement
25  about your Social Security numbers.  Is that your

## Page 11

1  signature?
2  A.  My signature and I read it.
3  Q.  And you read it.
4  And the information was correct?
5  A.  Correct.
6  Q.  Okay. And the next is the Verification of
7  Creditors Matrix?
8  A.  Yes.
9  Q.  And that's your signature?
10  A.  My signature and I read it before.
11  Q.  All right. And the only one then that I
12  think you didn't have is -- do you have the
13  Statement of Financial Affairs?
14  MR. CAMPBELL:  That's strange. I
15  don't see that. Yeah, Statement of Financial
16  Affairs. It's probably in here somewhere.
17  BY MR. ATKINSON:
18  Q.  Okay. Now, on April 27, 2018, you filed an
19  amended declaration concerning debtor's schedules.
20  And there were 14 pages of --
21  MR. CAMPBELL:  Let me make sure I have
22  it. That was the original, right? Here we go.
23  BY MR. ATKINSON:
24  Q.  Okay. I'll start with then the Summary of
25  Assets and Liabilities, the amendment, there's no

## Page 12

1  signature on that, there was no signature required.
2  The next item is Schedules E/F:  Creditors
3  Who Have Unsecured Claims.  That was -- the
4  amendment was filed on April 27. There's no actual
5  signature for this.  We'll get to where the
6  signature is later.
7  Did you review the amended Schedule E/F:
8  Creditors Who Have Unsecured Claims?
9  A.  Yes.
10  Q.  Okay. You read it before it was filed?
11  A.  Yeah, I read it.
12  Q.  Okay. And is the information -- is the
13  information in that correct?
14  A.  Sorry? Correct, yes.
15  Q.  Is the information in that correct?
16  A.  Yes.
17  Q.  And is the information in the summary of
18  your assets and liabilities and certain statistical
19  information correct?
20  A.  Yeah, correct.
21  Q.  Okay. And you also filed an amendment,
22  Statement of Financial Affairs for Individuals for
23  Filing Bankruptcy and there is a signature on that
24  on page 8.  I'm going to ask --
25  MR. CAMPBELL:  Something's going to

## Page 13

1  tell me that she didn't give me that.  She gave me
2  the file copy.  These are the file copies.
3  BY MR. ATKINSON:
4  Q.  Did you sign it?
5  A.  Yes.
6  Q.  When did you sign it?
7  A.  Friday, last Friday.
8  Q.  Okay. And is the information contained in
9  the petition -- in the Statement --
10  A.  Right.
11  Q.  -- of Financial Affairs as amended true?
12  A.  True, yes.
13  Q.  Are there any additions, deletions,
14  corrections or omissions?
15  A.  No.
16  Q.  And you also signed or there was also that
17  was filed an amended declaration concerning debtor's
18  schedules?
19  A.  Yeah.
20  Q.  Did you sign that?
21  A.  Yes.
22  Q.  And is that your signature?
23  A.  It is my signature.  True.
24  Q.  Okay. And you're saying that everything
25  that you filed is true?

Page 14

1  A.    Yes, yes.
2  Q.    Okay.  And you had read it all before the
3  amendments were filed?
4  A.    I read it.
5  Q.    Okay.  And one of the amendments was that
6  Mr. Campbell's retainer -- not retainer, his legal
7  fee for your Chapter 7 was $7,520, which was less
8  than originally reported, correct?
9  A.    Yes, yes, correct.
10 Q.    Okay.  Now, with regard to Mr. Campbell's
11 firm's representation of you, did you sign a
12 retainer agreement?
13 A.    Yes.
14 Q.    And when did you sign the retainer
15 agreement?
16 A.    I don't know date, but before the
17 application.
18 Q.    Yeah.  Well, I'm asking when?
19 A.    27 October.
20        THE COURT REPORTER:  I can't hear.
21        MR. CAMPBELL:  Yeah, you're going to
22 have to speak up.
23 A.    27 October.
24 Q.    27 October?
25        MR. CAMPBELL:  If you don't remember,

Page 15

1  you don't remember.
2  A.    I don't remember.
3  Q.    Okay.  Was it a written retainer?
4  A.    Yeah.
5  Q.    Okay.  And did the written retainer for the
6  Chapter 7 bankruptcy include anything other than
7  representing you in connection with the basic
8  bankruptcy?
9        MR. CAMPBELL:  If you don't know, you
10 don't know.  So you answer how you know.
11 A.    No.
12 Q.    Yeah.
13 A.    I don't know.
14 Q.    You don't know?
15 A.    No.
16 Q.    Well, did you read it before you signed it?
17 A.    Well, I read but I don't know how it large
18 or how it state.
19        MR. ATKINSON:  Okay.  I'm going to ask
20 for a copy of the retainer agreement.
21 Q.    Other than retainer agreement for the
22 bankruptcy, did you have any other retainer
23 agreements with the Giordano law firm?
24 A.    No.
25 Q.    Subsequent to the filing of the petition in

Page 16

1  bankruptcy -- oh, strike that.
2        When did you pay the retainer?
3  A.    Well --
4        MR. CAMPBELL:  Objection to the form.
5  But go on you, you can answer.
6  Q.    Did you pay the retainer?
7  A.    No, my -- my daughter paid it.
8  Q.    When did your daughter pay it?
9  A.    Before we sign the agreement, but I don't
10 remember the date.
11 Q.    You don't remember the date.
12        Okay.  When did you -- when did you first
13 discuss filing bankruptcy with Mr. Campbell?
14 A.    Before we sign agreement.  I don't
15 remember.
16 Q.    Well, obviously it was before you signed
17 the agreement.
18 A.    I don't remember exactly.
19 Q.    Was it in June of 2017?
20 A.    Maybe August, maybe June.  I don't
21 remember.
22 Q.    August or June?
23 A.    Maybe.
24 Q.    Okay.  Before the bankruptcy, was
25 Mr. Campbell's firm representing you in any other

Page 17

1  matter?
2  A.    No.
3  Q.    Now, calling your attention -- well, when
4  your daughter paid the retainer to Mr. Campbell, did
5  she pay it from her own funds or was it paid from
6  any entity in which she is a member, partner or
7  shareholder?
8  A.    No.  Own funds.
9  Q.    Her own funds.
10        And did she agree -- was that a loan?
11 A.    Yeah.  She gave money to attorney.  One day
12 I have money, I will pay her back.
13 Q.    Okay.  Is there a note?
14 A.    No, there's no agreement.
15 Q.    Is there anything in writing?
16 A.    No, verbally.
17 Q.    Okay.  And how did your daughter know to
18 send the money to --
19 A.    I asked from her.
20 Q.    You asked.
21        Was that by e-mail or was that by
22 telephone?
23 A.    By phone, right.
24 Q.    Okay.  And when you call your daughter, you
25 call on cell phone, by your cell phone or you call

USBC, District of NJ      In re Kamuran Cortuck, Debtor      Monday
No. 17-34019-CMG         Rule 341(a) Hearing       April 30, 2018

## Page 18

1     by a land line?
2     A.    I think my cell phone. I don't know.
3     Q.    Okay. And what's your cell phone number?
4     A.    (732) 331-8686.
5     Q.    Thank you.
6     A.    Okay.
7     Q.    And who is the provider? Who provides the
8     services?
9     A.    AT&T.
10    Q.    Thank you.
11        Now, calling your attention to the original
12    Schedule A/B that was filed, and Part 1, do you own
13    or have any legal or equitable interest in any
14    residence, building, land or similar property? And
15    you answered no.
16    A.    No. Yes.
17    Q.    Okay. Where do you presently reside?
18        MR. CAMPBELL: Where do you live now?
19    A.    Oh, I am living my daughter's home since 10
20    days or 15 days.
21    Q.    For the last 10 or 15 days?
22    A.    Yeah.
23    Q.    And what is the address of that home?
24    A.    Spy Glass, Spy Glass 5, Monroe.
25    Q.    Okay. And do you get your mail there?

## Page 19

1     A.    Not yet, but I have box under a UP address.
2    Because as you know that house also we are trying to
3    sell that house also for that reason. This is my
4    address now. That's my address.
5    Q.    Your address is, and I'll read it into the
6    record, 1600 Perrineville Road, Suite 2-109, Monroe
7    Township, New Jersey, 08831.
8    A.    Yeah.
9    Q.    And what is located at 1600 Perrineville
10    Road, Suite --
11    A.    Monroe.
12    Q.    Pardon me?
13    A.    Monroe.
14    Q.    No, what is it? What kind of building is
15    there?
16        MR. CAMPBELL: What's there?
17    A.    UPS building, UPS building.
18    Q.    So is that your post office box?
19    A.    Yeah, post box.
20    Q.    Okay. So you're not living there?
21    A.    No, no. I live now at my daughter's house,
22    but I didn't transfer all my rights there. We are
23    trying to do it now.
24    Q.    Okay. And that house is for sale, correct?
25    A.    Yeah. Before that reason I didn't -- until

## Page 20

1    now I didn't transfer my address, but maybe we will.
2    Q.    And do you have a lease with your daughter?
3    A.    My son did it. He also, my son also lives
4    me -- he making his agreement, my son did.
5    Q.    Your son made the agreement?
6    A.    With my daughter, yes. I am staying with
7    my son also there.
8    Q.    So where did you live before the last 10 or
9    15 days?
10    A.    Last 10 days, I am living Spy Glass.
11    Q.    Before that?
12    A.    Before that, I am in Monroe at my son's
13    house.
14    Q.    12 Marion?
15    A.    Merion Court, Monroe.
16    Q.    Okay. Now, getting back to 5 Spy Glass --
17    A.    Yeah.
18    Q.    -- your son doesn't live -- your son
19    doesn't live there, correct?
20    A.    No, he's living there now. He also lives
21    there. We transfer all our things there. He, son
22    and I, we live my daughter's house now.
23    Q.    Okay.
24    A.    And my son make an agreement with my
25    daughter.

## Page 21

1    Q.    And what is your daughter's name?
2    A.    Yisim, I -- Y-I-S-I-M, Yisim.
3    Q.    Okay. And what's her last name?
4    A.    Sakarya, S-A-K-A-R-Y-A, Sakarya.
5    Q.    Okay. And do you have any -- do you know
6    what the agreement is between your son --
7    A.    Yeah, I know roughly they make a monthly
8    agreement.
9    Q.    -- and your daughter?
10    A.    They make a monthly agreement, I think
11    2,300 or five or 2,500. I just -- the number
12    roughly, 3,000 a month yeah, I think, rent.
13    Q.    Do you know whether there's a mortgage on
14    that house?
15    A.    There is no mortgage at the house.
16    Q.    And do you have any agreement with your son
17    to make any payment to him?
18    A.    Verbally, verbally if -- if one day if I
19    have money, a source, I will share 50 percent of his
20    accommodation fees. Today I'm not able to be, but
21    we think eventually if I have a chance, I will do
22    it.
23    Q.    Now, the property at 12 Merion Court --
24    A.    Yeah.
25    Q.    -- is that property vacant?

(856) 983-8484         Tate & Tate, Inc.       (800) 636-8283
520 Stokes Road, Suite C-1, Medford, NJ 08055

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

## Page 22

1  A.   It sold. My son sold it.
2  Q.   He sold it?
3  A.   Yeah.
4  Q.   When did he sell it?
5  A.   I think ten days ago. (Indiscernible). I
6  don't know details.
7  Q.   Was that home in your son's name --
8  A.   Yeah, my son's name.
9  Q.   -- or another entity?
10 A.   It was my son's name.
11 Q.   Okay. Do you know what it sold for?
12 A.   A month you mean?
13 Q.   No. What he sold the house for.
14      MR. CAMPBELL: Yeah, how much?
15 A.   How much? I think 550 or 560 or something.
16 I don't know exactly. More than 500, but I don't
17 know exactly. Because there are some expenses
18 inside, deductions. I don't know exactly.
19 Q.   And when he sold the home --
20 A.   I think it --
21 Q.   Do you know --
22      MR. CAMPBELL: Wait for the question.
23 Q.   -- do you know whether or not there were
24 any mortgages on the home?
25 A.   Yeah, there was mortgages.

## Page 23

1  Q.   Was it paid off?
2  A.   Yeah. Why these things must be paid off.
3  Q.   Do you know how much the mortgage was?
4  A.   No, I don't.
5  Q.   When you were staying at your son's home at
6  12 Merion --
7  A.   Yeah.
8  Q.   -- were you paying rent?
9  A.   At the time also we have a verbally
10 agreement that I live -- I live there nearly four
11 years with my son. Okay. Verbally, from the first
12 day there that the agreement was one day if I have
13 money, I will share his expenses and after I
14 received some money from Swiss court, I paid him.
15 But from now, I will not able to pay him, but one
16 day if I have another source I will do it again.
17 Q.   Was there anything in writing --
18 A.   No, no.
19 Q.   -- that required you to make payment to
20 him?
21 A.   No, verbally.
22 Q.   And how much -- what was -- what was your
23 agreement?
24 A.   Our agreement is we make a calculation for
25 the new house. The cost per month is nearly 6,000

## Page 24

1  something for the new house, Spy Glass.
2  Q.   5? Okay.
3  A.   Yeah. We will share it and I will pay in
4  the future if I (indiscernible).
5  Q.   So if you don't get anything in the future,
6  you won't pay him?
7  A.   I will not pay.
8  Q.   Pardon me?
9  A.   I will not pay if I don't have. This
10 is -- is --
11 Q.   Okay. Now, let's get back to 12 Merion.
12 When did you move in? When did you move in with --
13 A.   Oh, in 2014, May or something, 2014, May.
14 Q.   And where did you live before that?
15 A.   Nowhere. I come here and I live there. I
16 was in Turkey before.
17 Q.   Okay. We'll get back to that.
18      Okay. Now, when you moved into 12
19 Merion --
20 A.   Yeah.
21 Q.   -- in May of 2014 --
22 A.   Yeah.
23 Q.   -- did you have any written agreement with
24 your son?
25 A.   No.

## Page 25

1  Q.   Did you have any oral agreement with your
2  son?
3  A.   Oral agreement, yes.
4  Q.   What was the oral agreement?
5  A.   I told him that we are using same house
6  together, we are only two, he's single and I am
7  single, and I promise him one day if I have money, I
8  will pay half of your investments. And at that
9  time, we calculated our three, 4,000 or something
10 per month I must pay for it because at that time,
11 cost is more higher than Spy Glass.
12 Q.   Did your son ever tell you -- so the cost
13 was $8,000 a month?
14 A.   Roughly. And we greed to share it and my
15 obligation is $4,000, roughly $4,000.
16 Q.   Did your son ever show you what the cost to
17 maintaining the house was per month?
18 A.   Yeah, I know it because we calculate
19 together to find a number.
20 Q.   When did you do that?
21 A.   At the beginning. Roughly, I know it is
22 8,000 and I accept 4,000.
23 Q.   Okay. Now, when you first came to the
24 United States in May of 2014 --
25 A.   Yeah.

7 (Pages 22 to 25)

USBC, District of NJ                In re Kamuran Cortuck, Debtor                Monday
No. 17-34019-CMG                    Rule 341(a) Hearing                         April 30, 2018

## Page 26

1    Q.   -- was that the first time you'd been to
2    the United States?
3    A.   No, no.  As a -- as a green card holder,
4    this is the first time.
5    Q.   Okay.
6    A.   But before that, maybe I come more than
7    five or six times.  (Indiscernible).
8    Q.   And after you came here, you started
9    working, correct?
10   A.   Yeah, yeah.
11   Q.   And where were you working?
12   A.   I work with Iron Bridge Company.
13   Q.   Which Iron Bridge Company did you work for?
14   A.   What, in --
15   Q.   Well, there's an Iron Bridge Contractors,
16   correct?
17   A.   Contractors, yes.
18   Q.   And there's an Iron Bridge Companies, LLC,
19   correct?
20   A.   Yeah.
21   Q.   Okay.
22   A.   I worked -- I worked with Iron Bridge
23   Contractors.
24   Q.   Okay.  And how much were you paid a month?
25   A.   As a net amount, between 6,000 to 7,000

## Page 27

1    according to taxes, between six and seven, sometimes
2    640 sometimes.
3    Q.   And what was your gross supposed to be?
4    A.   120 I think my gross was.
5    Q.   Okay.  And what did you do for Iron Bridge
6    Construction?
7    A.   It was a construction company and I am
8    civil engineer.  In my past, I developed civil
9    engineering jobs.  I helped them for the company and
10   for the relations for the partners and I --
11        THE COURT REPORTER:  I'm sorry.
12   A.   I worked with them as an engineer and a
13   consultant and as I --
14   Q.   Did you have a written employment contract?
15   A.   Yes.
16   Q.   Please provide me with a copy of the
17   written employment contract.
18        MR. CAMPBELL:  Do you have it?
19   A.   We will not.  I left from the company.  I
20   don't have it.
21   Q.   Okay.  But you'll get it?
22   A.   We will ask.  We will ask.
23   Q.   Who are you going to ask?
24   A.   From the company.
25   Q.   Your son?

## Page 28

1    A.   My son or the others.
2    Q.   The company -- we've referred to your son a
3    few times.  What's your son's name?
4    A.   My son is Sirkan, S-I-R-K-A-N, Sirkan.
5    Q.   Okay.  And what -- does -- what is his
6    position at Iron Bridge Contractors?
7    A.   He was partner.
8    Q.   He was?
9    A.   Partner.  Then I -- then I begin the job.
10   Q.   Okay.  What is he now?
11   A.   Now he left company.
12   Q.   When did your son leave the company?
13   A.   I don't know exactly, but I think one of
14   two -- I don't know exactly the date.
15   Q.   Okay.  Was it after you filed your
16   bankruptcy petition?
17   A.   Yes.
18   Q.   Was it in January?
19        MR. CAMPBELL:  If you don't know --
20   A.   I don't know exactly the date.
21   Q.   Well, I'm not asking you the exact date.
22   I'm asking for an entire month.
23   A.   Oh, yeah, yeah, yeah.  Maybe -- now we are
24   in May, maybe January or maybe February.  I don't
25   know.

## Page 29

1    Q.   And what percentage of Iron Bridge
2    Contractors did your son own?
3        MR. CAMPBELL:  Objection to the
4    question, but go ahead and answer it if you know it.
5    I don't understand the relevance.
6    A.   I don't know exactly it is because he has
7    many companies and he had different shares.  I don't
8    know exactly what his share.
9    Q.   Was he the president?
10   A.   I think he's one of the member of the
11   board.  I don't know exactly president or I don't
12   know.  He's one of the partners what I know.  I
13   don't know details, the other details.
14   Q.   Okay.  When you were at Iron Bridge
15   Contractors, who did you report to?
16   A.   I report one of the other members who is
17   engineer.  My son is not engineer.  There's another
18   guy who is engineer.  I worked very near to with him
19   because I had some -- not financial, I had the
20   engineering way.
21   Q.   And who was that?
22   A.   Cihan.
23   Q.   Can you spell that?
24   A.   C-I-H-A-N.
25   Q.   Is that his first name or last name?

8 (Pages 26 to 29)

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

## Page 30

1   A.   That's his first name.
2   Q.   And what is his last name?
3   A.   I-Y-I-R -- Ayar.
4   Q.   Ayar?
5   A.   Ayar, yes.  I-Y-A -- A-Y-A-R, Ayar, Cihan
6   Ayar.
7   Q.   Thank you.
8        Now, when your son stopped working at Iron
9   Bridge, did he sell it?  Did he sell his interest?
10  A.   Yeah, I know he sell -- I know that he sell
11  his shares.
12  Q.   Does he have anything to do with Iron
13  Bridge right now?
14  A.   No, I think no relations.  Sometimes maybe
15  he helps them for some -- information, but he's not
16  working there.
17  Q.   Okay.  And who would I ask to get your
18  employment contract?
19  A.   You can ask Cihan Ayar.
20  Q.   Okay.
21  A.   You can ask.
22  Q.   That's the same person?
23  A.   The same guy.  He's continue now.  He's
24  working for the company.
25  Q.   Okay.  Did you know him before you started

## Page 31

1   working there?
2   A.   Yes, I know him.
3   Q.   How long had you known him?
4   A.   I know him since maybe he's -- now he's 50
5   years old, something, I know him from ten years old.
6   Q.   So the present owner -- is he an
7   owner -- he's a partner in Iron Bridge?
8   A.   He's partner now, yes.  Stayed.
9   Q.   And so since you've known him you say for
10  40 years --
11  A.   Yeah.
12  Q.   -- I take it you knew him when you were in
13  Turkey?
14  A.   Yeah, yeah.
15  Q.   Okay.  Did he work for any of your
16  companies in Turkey?
17  A.   No, no.  They have houses near to our
18  house.  Because of that I know.  There is no
19  relation in Turkey, work relation between.
20  Q.   Okay.  And where is your house in Turkey?
21  A.   We have a summer house in Izmir at that
22  time and we are living together.  I know him because
23  of that.
24  Q.   Izmir?
25  A.   Izmir, yes.

## Page 32

1   Q.   How do you spell that?
2   A.   I-Z-M-I-R, Izmir.
3   Q.   Okay.  And is that a city in Turkey?
4   A.   Yes, it's a city.
5   Q.   Were you the owner of that house?
6   A.   No.  At that time, yes, 14 years ago,
7   but --
8   Q.   Okay.
9   A.   -- I think we sold that house maybe more
10  than 20 years ago.
11  Q.   Okay.  And before you came to the United
12  States in May of 2018, where did you live?
13  A.   Sorry, 2000?
14  Q.   2014?
15  A.   '14.  I live in -- in Turkey.
16  Q.   Okay.  Where in Turkey did you live?
17  A.   I must give you the address.
18       MR. CAMPBELL:  Are you asking for a
19  city or --
20  A.   The city, Istanbul.
21  Q.   Istanbul?
22  A.   Yeah.
23  Q.   And what was the address?
24  A.   Okay.  It's a long one.
25       MR. CAMPBELL:  Just for the record,

## Page 33

1   the debtor's giving you a card that's a laminated
2   card.
3   BY MR. ATKINSON:
4   Q.   Okay.  Mr. Cortuk, is this the address, the
5   one at the top?
6   A.   This one, Istanbul.
7   Q.   So that would be Ulus Mah?
8   A.   Mah.
9   Q.   Kelaynak?
10  A.   Kelaynak Sokak.
11  Q.   Sokak?
12  A.   Yeah.
13  Q.   Panaroma?
14  A.   Panaroma Sitesi.
15  Q.   Sitesi?
16  A.   Yeah.
17  Q.   7?
18  A.   Yes.
19  Q.   7 and then it's B-B-L-O-K-N-O 17 -- it's
20  colon 17/2 34330 Besiktas/Istanbul?
21  A.   Yeah, that's address.
22  Q.   And who owned that property?
23       THE COURT REPORTER:  Don't put that
24  away.
25       MR. ABRAMOWITZ:  Excuse me.  May I

9 (Pages 30 to 33)

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

## Page 34

1 have that, please? I'd like to take a picture?
2     MR. CAMPBELL: No, you can subpoena
3 him for it.
4     THE COURT REPORTER: Well, I'm going
5 to need it for the transcript.
6     MR. CAMPBELL: He used it to refresh
7 his recollection about what the address was. If the
8 trustee wants to ask him for a copy of it, we'll
9 obviously oblige by the trustee if we think it's
10 relevant, but I need to make a determination --
11     MR. ABRAMOWITZ: You're saying it
12 helped refresh his recollection you said?
13     MR. CAMPBELL: Yes, sir.
14     MR. ABRAMOWITZ: Well, then why
15 doesn't he put it away and give us address again
16 unless he needs that for the address? But I think
17 the trustee.
18     MR. ATKINSON: You know what, I'm
19 going to take a picture of it because it's confusing
20 to me. So how is that?
21     Thank you.
22 BY MR. ATKINSON:
23 Q.   And who is the owner of that property?
24 A.   My daughter.
25 Q.   Have you ever -- is it in her individual

## Page 35

1 name?
2 A.   The name of my daughter?
3 Q.   No, no. Is the property in your
4 daughter's --
5 A.   Yeah.
6 Q.   -- individual name as opposed to an entity?
7     MR. CAMPBELL: To the extent you know
8 what the deed is on the -- on the property.
9 A.   This is her house.
10 Q.   I know. So it's her house?
11 A.   Yeah.
12 Q.   Okay. It's not owned by a company that
13 she's --
14 A.   No, no, no, no. Her name.
15 Q.   Her name.
16     Is she the sole owner of the house?
17 A.   Yeah, sole owner of the house.
18 Q.   And how long have you lived there?
19 A.   Four years or something.
20 Q.   And did you pay her any rent?
21 A.   Yes.
22 Q.   How much did you pay her?
23 A.   Again, word really. Sometimes when I have
24 money, I gave her and she (indiscernible). I think
25 it's roughly 2,000, something like that.

## Page 36

1 Q.   What?
2 A.   $2,000 per month.
3 Q.   $2,000 per month?
4 A.   Roughly, yeah. According to monthly
5 expenses and also change sometimes, but roughly
6 2,000.
7 Q.   And was that agreement in writing?
8 A.   No.
9 Q.   In the period November 29, 2016 to November
10 29, 2017, did you pay your daughter any money?
11 A.   Between 2016? Yes, I paid her.
12 Q.   How much did you pay her in 2016, in the
13 year 2016 --
14 A.   The money.
15 Q.   -- excuse me -- from November 29, 2016 --
16 A.   Yeah. One year.
17 Q.   -- to November 29, 2017, how much did you
18 pay her?
19 A.   Just that one year you mean? Okay?
20 Q.   Just that one year.
21 A.   Yeah, I think I paid her roughly $2,000 --
22 $250,000.00 or something, 256 or something. I don't
23 remember exactly.
24 Q.   Okay.
25 A.   I think we have the --

## Page 37

1     MR. CAMPBELL: Yeah, you have it here
2 if you need to remember exactly.
3 BY MR. ATKINSON:
4 Q.   Okay. So you paid her $256,000?
5 A.   Yeah, umm-hmm.
6 Q.   And what was the source of that payment?
7 A.   That payment is in Switzerland.
8 Q.   Pardon me?
9 A.   In Switzerland.
10 Q.   Yep.
11 A.   I had health insurance policy, which is
12 more than $3 million. And I had some companies
13 there and those companies have some cash in their
14 accounts. According to prosecutor in Geneva, he
15 made a block on all the accounts, all the company
16 accounts and my health insurance accounts as a
17 blockage. I needed two years in 2014, I think 2013
18 or 2014 up until 2016.
19 Q.   Umm-hmm, right.
20 A.   Then once I did (indiscernible).
21 Q.   It is what it is.
22     MR. CAMPBELL: It is what it is.
23 Q.   Just try to speak a little bit slower --
24 A.   Okay. Okay.
25 Q.   -- and louder.

10 (Pages 34 to 37)

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

## Page 38

1     A.   Okay. In Switzerland, I have life
2 insurance policy, more than $3 million, roughly 3
3 point. Of course, these are including bonds. I
4 cannot give a rough, I can't say roughly, and I have
5 some companies there which belongs to me and those
6 companies' accounts there are some money also, each
7 of them have some money.
8     Q.   Okay.
9     A.   But in 2014, around '14, see, I don't know
10 exactly the date, the prosecutor in Geneva with the
11 question of bank, bank ask prosecutor that I had the
12 sources there and the bank want to learn is it clean
13 money or what is that because I become green card
14 holder here. And as I know, there are agreements
15 between America and Switzerland and they want to
16 declare to the prosecutor that this money is clean
17 or not.
18     Q.   And which bank was that?
19     A.   Credit Suisse.
20     Q.   Credit Suisse. Okay.
21     A.   There are some other bank, but the question
22 comes from Credit Suisse. Okay?
23     Q.   Okay.
24     A.   And after this question, prosecutor make a
25 decision, blockage all the sources, bank accounts,

## Page 39

1 health insurance, everything. He blocked
2 everything. Okay?
3     Q.   Okay. Now, when you said you had 3,000 --
4 over $3 million in a life insurance policy?
5     A.   Yes, yes.
6     Q.   Who was the underwriter of that policy?
7 Who issued the policy?
8     A.   I.
9     Q.   No?
10     A.   No.
11     Q.   You were the owner of the policy?
12     A.   I owned the policy, yes.
13     Q.   Who --
14     A.   Credit Suisse issued the policy. They
15 issued the policy.
16     Q.   Okay. And when did you get that policy?
17     A.   In 2013 or '14. I don't know. Maybe '12,
18 maybe '13. I don't know.
19     Q.   2012 or '13?
20     A.   Yeah.
21     Q.   Okay. And did you get that policy -- were
22 you living in Switzerland at the time?
23     A.   No, I was living in Turkey.
24     Q.   You were living in Turkey. And where did
25 you -- where did you get the $3 million to buy the

## Page 40

1 policy?
2     MR. CAMPBELL: Objection to the form.
3 But go ahead and answer.
4     Q.   Did you buy the policy?
5     A.   I buy the policy.
6     Q.   And how much did you pay for the policy?
7     A.   At the time, more than $3 million.
8     Q.   More than $3 million?
9     A.   Umm-hmm.
10     Q.   And when you paid the more than $3 million,
11 did it come out of an account that you owned or
12 controlled?
13     A.   It comes from account, yes.
14     Q.   Okay. And where, what account was that?
15     A.   One of my companies' account.
16     Q.   Okay. And which company was that?
17     A.   I don't remember exactly. Because I had
18 many companies, I had four or five. I don't know
19 which one.
20     Q.   Okay. Now, you said that the prosecutor in
21 Switzerland froze your accounts from many of your
22 companies. Which companies did he freeze the
23 accounts of?
24     A.   Four or five companies, but I don't
25 remember exactly. Four or five.

## Page 41

1     Q.   Well, what companies did you have in 2014?
2     A.   In 2014, if you ask Turkey, I have maybe 50
3 companies, 45 companies.
4     Q.   45 companies?
5     A.   Yeah.
6     Q.   How many companies did you have bank
7 accounts in Switzerland in 2000 --
8     A.   Four or five.
9     Q.   Four or five?
10     A.   Yeah.
11     MR. CAMPBELL: You have to wait until
12 he finishes the question.
13     Q.   And who, was there anyone managing those
14 accounts for you?
15     A.   Yeah, there are management companies.
16     Q.   And who is the management company?
17     A.   I don't remember because I changed three or
18 four times. I don't know what was the last one or I
19 don't know what was that time.
20     Q.   Okay. Do you have business records of the
21 accounts that were frozen?
22     A.   What do you mean?
23     Q.   Well, you -- when the accounts were
24 frozen --
25     A.   Yeah.

11 (Pages 38 to 41)

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

### Page 42

1  Q.   -- did you receive a notification from the
2  bank?
3  A.   Yeah, bank informed me that.
4  Q.   Okay.  Were all of the accounts at Credit
5  Suisse?
6  A.   No, some of them the other banks.
7  Q.   Okay.  What banks were they in?
8  A.   I don't remember.  There are three or four
9  banks.
10  Q.   When you received notification that your
11  accounts were frozen and your company's accounts
12  were frozen, who notified you?
13  A.   Personal bank informed me because bank
14  informed me that that --
15  Q.   Okay.
16  A.   -- and also prosecutor sent me a letter at
17  that time.
18  Q.   Okay.  Do you have a copy of that letter?
19  A.   No, I don't have, no.
20  Q.   Did each of the banks send you a letter?
21  A.   No.  I don't remember.  I don't remember.
22  Maybe they send it.
23  Q.   Did Credit Suisse send you a letter?
24  A.   Credit Suisse told me.  I think they didn't
25  send me a letter because at the time of prosecutor,

### Page 43

1  they said only the prosecutor can talk to me about
2  this subject.  Do you understand?  They said that we
3  are now blocked.
4  Q.   Okay.
5  A.   They didn't contact me.  I asked my
6  documents, but they said we cannot give you
7  anything, give it to you anything form prosecutor.
8  Q.   And did you utilize in Switzerland a
9  company by the name of Dominion?
10  A.   Yeah, Dominion was a management company,
11  last management company.  But then the prosecutor
12  make blockage to our accounts.  I don't remember it
13  is Dominion because before that I worked two or
14  three different companies before.  I changed them
15  sometimes.
16  Q.   Okay.  Did you have a company by the name
17  of NWT managing your financial affairs?
18  A.   Yeah, they also work with us, maybe before
19  Dominion I think.  Yeah.  I worked three or four
20  different companies in the long period because those
21  accounts are I think from 2004, 2005.  Do you
22  understand?  Many years.
23  Q.   And who was the person that you were
24  working with at NWT?
25  A.   Many different people.  I don't remember

### Page 44

1  the names.
2  Q.   Do you remember the name of a Marie Franz?
3  A.   Yeah, Marie Franz worked with us in NYT,
4  not Dominion I think.  NYT, she is working with us.
5  Q.   Okay.  And did she work with you before she
6  was at NWT?
7  A.   Yes, maybe.  Yes, I think, yes.
8  Q.   All right.  And when she was working with
9  you at NWT and the previous company, do you remember
10  that previous company's name?
11  A.   No.
12  Q.   Okay.  Do you have any of your copies of
13  any of your communications with Marie Franz at NWT,
14  such as e-mails or --
15  A.   I don't have anything.  Because I left
16  everything in Turkey and I come here without any
17  documents because I don't have (indiscernible) for
18  anything.
19  Q.   Okay.  Do you have any documents -- strike
20  that.
21         Do you have any copies of communication,
22  e-mail or --
23  A.   I don't have anything.
24  Q.   -- with Dominion?
25  A.   Personally, no.  I don't have any e-mails.

### Page 45

1  Today I only have small file with me.
2  Q.   Okay.  Personally, I'm not asking what you
3  brought with you, but do you have those records
4  someplace?
5  A.   No.
6  Q.   Okay.
7  A.   Personally, no.
8  Q.   You said personally, no.  So let's say are
9  any of your records, the e-mails, correspondence,
10  financial records on any entity -- do you know what
11  I mean by an entity?
12  A.   Companies also included, yeah.
13  Q.   Yes.  Company, on their computers?
14      MR. CAMPBELL:  Objection to form, but
15  go ahead and answer.
16  A.   I don't have today in my hand any documents
17  about my last (indiscernible).
18  Q.   I'm not asking you about what you have in
19  your hand.
20  A.   Okay.  What are you asking then?
21  Q.   Okay.  I'm asking you whether your business
22  records, your e-mails --
23  A.   No, nothing.
24  Q.   -- your financial records --
25  A.   Nothing.

(856) 983-8484

Tate & Tate, Inc.
520 Stokes Road, Suite C-1, Medford, NJ  08055

(800) 636-8283

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

## Page 46

1  Q.  -- are on any computer or --
2  A.  I don't have anything with me.
3  Q.  I didn't ask if you have anything with you.
4  We can -- I'll ask this question a hundred times in
5  a row --
6  A.  You can ask.  You can ask.
7  Q.  -- but please just answer, I'm not asking
8  what you have with you.
9  A.  Okay.
10  Q.  Listen to my question one more time.
11  A.  Okay.
12  Q.  I hope it's only one more time.
13  A.  Yes.  Ask.
14  Q.  Are any of your e-mail records on any
15  computer of any company that you know about?
16  A.  No.
17  Q.  By the way, do you use a computer?
18  A.  No, I have phone.  I'm not so able to
19  manage those things.  All my life, somebody did for
20  me, my secretaries and other people.  Technology --
21  technologically I am --
22  Q.  Do you have a laptop?
23  A.  I have the iPad, yes.
24  Q.  Okay.  Do you store e-mails on your iPad?
25  A.  No.  I am not using e-mail or nothing.

## Page 47

1  Q.  You don't save anything?
2  A.  No.
3  Q.  What is on your iPad?
4  A.  On my iPad, some movies, some small --
5  (indiscernible) pictures.  Technologically, I only
6  use phone, nothing more.  And I know -- I know how
7  to type in this country.  Okay?  Before that in my
8  life, I never did anything, everybody did something
9  for me.
10  Q.  Are there any -- that's a very privileged
11  life you lead.
12  A.  I had 13,000 workers.  I had 42 companies.
13  I have -- I had two planes, personal planes.  Okay.
14  I had every city one secretary, in every city one
15  home.  I am sitting at the planes.  I never touch, I
16  never write anything.  All my life, I use these
17  cards.  Okay?
18  Q.  What type of planes did you have?
19  A.  I had one Cessna, the other one's --
20  Q.  The Cessna was little, right?
21  A.  The Cessna, yeah.
22  Q.  Okay.  Was that in your name or was that in
23  the company name?
24  A.  No, company name.
25  Q.  What company was the Cessna in?

## Page 48

1  A.  Bayindir Insaat, Bayindir Insaat.
2  Q.  Was that Bayindir Holding Company --
3  A.  Holding company, also construction company
4  with the same name.
5  Q.  No, but I mean which one owned the plane?
6  A.  Oh, Bayindir Insaat.
7  Q.  Insaat.
8      MR. ARTIS:  Could you say that slowly
9  or spell it?
10      THE WITNESS:  Okay.  The name?
11      MR. ARTIS:  Yes, yes.
12      THE WITNESS:  B-I-Y-I-N-D-I-R,
13  Construction, Bayindir Construction.
14  BY MR. ATKINSON:
15  Q.  And then there was another, Bayindir
16  Insaat?
17  A.  Insaat is construction, yes.
18  Q.  Does that mean construction in Turkish?
19  A.  Construction, yeah, in Turkish, yes.
20  Q.  That makes things a lot clearer.
21  A.  Okay.
22  Q.  Okay.  And who was the owner of Bayindir
23  Construction?
24  A.  I am one of the owners.  We have five
25  owners and I am one -- I am one of them.

## Page 49

1  Q.  And what percentage did you own?
2  A.  More than 22 or 23, something like that.
3  Q.  What position -- were you on the board of
4  directors of Bayindir?
5  A.  I was -- Bayindir Insaat, Bayindir Insaat,
6  I was member of board.
7  Q.  You were a member of board?
8  A.  Board, yeah.
9  Q.  Okay.  Were you also an officer?
10  A.  What do you mean, an officer?
11  Q.  Were you a president, vice-president?
12  A.  No, no, I am member of the board only.
13  Q.  Just a member of the board?
14  A.  Yeah, yeah.
15  Q.  Were you the chairman of the board?
16  A.  No.  Chairman of the board, I am -- I am
17  the holding company chairman of the board.
18  Q.  Okay.
19  A.  Not the company.
20  Q.  The holding company would be Bayindir
21  Holdings?
22  A.  Yeah.
23  Q.  Okay.  And so it owned all of the shares
24  of -- strike that.
25  A.  No, it's just so complicated.  It is

13 (Pages 46 to 49)

USBC, District of NJ      In re Kamuran Cortuck, Debtor      Monday
No. 17-34019-CMG      Rule 341(a) Hearing      April 30, 2018

### Page 50

1   another company, the holding means in Turkey doesn't
2   mean he has everything.  Okay?
3   Q.     Okay.
4   A.     Holding is a company, a name of the
5   company.  In some countries, holding means is owner
6   of the everything.  No, in Turkey it is not like
7   that.  These are the companies.
8   Q.     So what did Bayindir Holding do?
9   A.     Holding is — they have some shares in some
10   of the companies.  Example, Bayindir Holding is
11   shareholder of also Bayindir Insaat because we
12   have — as I told you, we have 42 companies.
13   Q.     Right.
14   A.     He has some shares for every company.
15   Q.     Okay.  So it has -- shares of all your
16   companies were in Bayindir?
17   A.     Not all, some.
18   Q.     Well, some of your companies?
19   A.     Yeah.
20      MR. CAMPBELL:  Just, could we get a
21   time frame here?  I don't know where -- when we're
22   talking about.  I just want to make sure the
23   record's clear.
24   BY MR. ATKINSON:
25   Q.     Well, do you still own -- strike that.

### Page 51

1      Do you have any interest in Bayindir
2   Holdings --
3   A.     No.
4   Q.     -- at the present time?
5   A.     No.
6   Q.     When did you last have an interest in
7   Bayindir Holdings?
8   A.     2001, until 2001, I was chairman of
9   Bayindir Holding.  After a crisis in Turkey, there
10   was a crisis at that time, there's a governmental
11   institute --
12      MR. CAMPBELL:  There's a what?
13   A.     There's a governmental institute.
14      MR. CAMPBELL:  Governmental institute.
15   A.     Take over our companies.
16   Q.     Okay.  Were all of your companies taken
17   over?
18   A.     Yeah, by the government.  And after that --
19   Q.     Was that just the companies that were in
20   Bayindir Holdings?
21   A.     All the companies, 42 companies.
22   Q.     Okay.  But were all 42 in Bayindir
23   Holdings?
24   A.     Yeah.  Not Holding, all 42 companies, all
25   the companies, some of them is directed Bayindir

### Page 52

1   Holding, some of them is personal share.
2   Q.     Okay.  And so Bayindir owned a Cessna.  So
3   was the Cessna sold?
4   A.     Yeah, many years ago, 2000 or maybe before
5   that.
6   Q.     Did the government entity --
7   A.     No.
8   Q.     -- sell it?
9   A.     No, we sold it before.
10   Q.     You sold it before?
11   A.     Yeah.
12   Q.     Okay.  What other plane did you have?
13   A.     It was a French Falcon.
14   Q.     And --
15   A.     It is also sold.
16   Q.     And what company owned that one?
17   A.     I think this -- as I remember it was
18   Bayindir Insaat also.
19   Q.     Okay.  So --
20   A.     Because Bayindir Insaat is the main
21   company.
22   Q.     Okay.  And was that sold before the
23   government takeover in 2001?
24   A.     Yes, before, yeah.
25   Q.     Okay.  So the government took over -- after

### Page 53

1   the government took over Bayindir Holdings and your
2   interest in the 42 companies that you had throughout
3   the world --
4   A.     Yeah.
5   Q.     -- did you have any other companies that
6   weren't in Turkey?
7   A.     No.  All the companies which I relate.
8   Okay?
9   Q.     Okay.  So after the companies were taken
10   away --
11   A.     Umm-hmm.
12   Q.     -- in 2001, you had no more companies?
13   A.     I don't have companies, but I am
14   responsible.  I made an agreement with the
15   government.  It was a loan agreement.  Okay?  They
16   give me a chance to continue with the companies and
17   I worked with those companies until 2012, not as an
18   owner.  The government take over those companies,
19   but we made an agreement with them.  Okay?  I tried
20   to take them back, we made an agreement, loan
21   agreement, payment agreement.
22   Q.     Umm-hmm.
23   A.     Until 2013 or something, I worked for those
24   companies.  I continued to work.
25   Q.     Okay.

14 (Pages 50 to 53)

USBC, District of NJ                     In re Kamuran Cortuck, Debtor                          Monday
No. 17-34019-CMG                              Rule 341(a) Hearing                            April 30, 2018

Page 54

1   A.      But -- by my shares is -- all my shares is
2   blocked with the government (indiscernible).
3   Q.      Are they still blocked?
4   A.      Yeah.
5   Q.      Now, you said 2012 once and you said 2013.
6   A.      I don't remember exactly when I -- because
7   until after that date, they cancelled the agreements
8   which we did before.  It was not workable.  It
9   wasn't managed what they breached from us.
10  Q.      Okay.  So when you said the government
11  blocked your shares, what do you mean by they
12  blocked your shares?
13  A.      Well, it means that in 2001, there was a
14  very big crisis in Turkey, economical crisis.
15  Q.      Right.
16  A.      In one night, in one night, $1 is 300
17  Turkish lira, $1 is equal 300 Turkish lira.  In one
18  night, $1 becomes 1,700 Turkish Lira.  That means
19  five times today.
20  Q.      Your value went down by --
21  A.      Yeah, and after that --
22  Q.      -- by 500?
23  A.      -- not only our company, in Turkey, nearly
24  20 big companies lost all their capital and all
25  capital becomes minus.  Not only me.

Page 55

1   Q.      Right.
2   A.      And after that, government take a decision
3   to block all those companies to gain again to the
4   life.  Okay?
5   Q.      To try and get them back to life?
6   A.      Yeah, yeah.
7   Q.      Okay.
8   A.      And they give us a chance to manage it
9   again.  Okay?
10  Q.      Okay.
11  A.      Because -- because all our shares, all our
12  capital is -- becomes minus in one night --
13  Q.      Right.
14  A.      -- because of the change of currency.  Then
15  the -- then the companies becomes minus.  The
16  companies must blocked or closed in Turkey.  They
17  blocked it and they give us a chance.  They make
18  agreements with us, okay, to take those companies
19  alive.
20  Q.      Okay.  But -- so but they were blocked and
21  so you then managed the companies --
22  A.      Yeah.  We can't control let us say.
23  Q.      -- from 2001 to 2012 or 2013?
24  A.      (Indiscernible).  Yeah, yeah.
25  Q.      All right.  And your shares of stock in

Page 56

1   those companies --
2   A.      Yeah.
3   Q.      -- or the shares of stock that some
4   companies owned in other companies --
5   A.      Yeah, same thing, same -- all the shares is
6   blocked.
7   Q.      Were they -- they were blocked?
8   A.      Yeah.
9   Q.      Were they confiscated or do you still own
10  them?
11  A.      In fact, we don't know what is the
12  situation now because in 2013, in 2013 they will
13  cancel agreement, okay, and the companies is not
14  running now.  Okay?  Some of them is bankrupt, some
15  of them is closed, some of them in their hand yet.
16  Q.      And were you paid an income by these
17  companies during the period 2001 through 2012 --
18  A.      Yeah, yeah.
19  Q.      -- and 2013?
20  A.      Yeah, I take salary from there.  I work as
21  a professional in my company.
22  Q.      Did the government have to approve your
23  salary?
24  A.      I don't know.  But we worked at it because
25  they didn't -- they didn't change our working style.

Page 57

1   Okay?  They give us a chance because at the time,
2   they decided that it is not our fault.  Okay?  A
3   crisis happened and --
4   Q.      Umm-hmm.  Now, do you have a copy of the
5   agreement --
6   A.      No.
7   Q.      -- with -- the one that was broken by the
8   Turkish government with you?  Do you have a copy of
9   that agreement?
10  A.      Yeah, maybe I will find it.  With me now,
11  no.
12  Q.      Well, where would it be?
13  A.      Well, people ask from the government
14  institute, get a copy from them.
15  Q.      Okay.  So you didn't keep a copy of it?
16  A.      No.
17  Q.      Did you have any representative in
18  Turkey --
19  A.      No.
20  Q.      -- helping you?
21  A.      No.
22  Q.      No.
23  A.      Only I have some lawyers.  That's all.
24  Q.      Okay.  Do your lawyers have copies of the
25  agreement?

15 (Pages 54 to 57)

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

Page 58

1   A.     Maybe.
2   Q.     Okay.
3   A.     I don't know.  I will check.
4   Q.     Who were you -- what lawyers were you using
5   in 2012 or '13 when the Turkish government broke the
6   agreement?
7   A.     I had many -- in company, I also -- I have
8   many lawyers and outside I have -- I had some
9   lawyers because today, today, in our court case, the
10  government institute country in Turkey.
11  Q.     Okay.
12  A.     We had again to open a case against them,
13  but they did.  It is not resolved.
14  Q.     Who opened a case against the government in
15  Turkey?
16  A.     They opened a case against us.  They said
17  that this is your fault.
18  Q.     Okay.  Turkey opened a case against --
19  A.     Yeah.  And we are fighting against them.
20  It is not finalized yet.
21  Q.     Okay.  And who is us?
22  A.     Us means I.
23  Q.     You?
24  A.     Yeah, personally.  And some of my partners
25  also, they open up cases.  Sometimes we use same

Page 59

1   lawyer.
2   Q.     Okay.  And that case is still pending?
3   A.     Yeah, still pending.
4   Q.     And what is the name of the lawyer who's
5   representing you in Turkey in that case?
6   A.     I -- I have many, but -- I do not work
7   those questions that you are going to ask me.
8   Q.     Well, you have an attorney, you have an
9   attorney in the United States, correct?
10  A.     Yeah, I know.
11  Q.     Who's that?
12  A.     I know him only that because I am working
13  with him now.  But last ten years, last let us say
14  five, seven years, I never work and think about it.
15  Q.     I'm not asking five or ten years ago.  You
16  said that --
17  A.     It is pending (indiscernible).
18  Q.     You just testified that the government of
19  Turkey has a case against you --
20  A.     I -- I --
21  Q.     Wait, wait, wait.  The government of Turkey
22  has a case against you?
23  A.     Yeah.
24  Q.     You are represented by an attorney?
25  A.     Yes.

Page 60

1   Q.     That case is ongoing?
2   A.     Yes.
3   Q.     Who is your attorney?
4   A.     Aykut.
5   Q.     Could you spell that?
6   A.     May I write it?
7   Q.     Yes, that would be great and then I'll
8   spell it.
9   A.     Okay.
10  Q.     Okay.  That's Arut?  Is that Arut?
11  A.     Aykut.
12  Q.     A-Y-K-U-T, last name is Özorhan?
13  A.     Özorhan.
14  Q.     That's O with an umlaut above it --
15  A.     Yeah, yeah.
16  Q.     Z-O-R?
17  A.     H-A-N.
18  Q.     -- H-A-N?
19         Okay.  Please provide me -- get -- have
20  Mr. Campbell provide me with the address, the
21  e-mail --
22  A.     Okay.
23  Q.     And the phone number of Mr. Özorhan.
24  A.     Okay.
25  Q.     Okay.  And ask Mr. Özorhan for a copy of

Page 61

1   the agreement that you have had with the government
2   of Turkey that they breached, according to you, and
3   give it to Mr. Campbell and he'll give it to me.
4   Okay?
5   A.     Okay.  Do you need agreement which is on
6   the government and the court -- you want to learn
7   what is the court case now.  Okay?
8   Q.     That would be great.
9   A.     Right.
10  Q.     Okay.
11  A.     I shall find --
12  Q.     Am I going to be able to read it?  Is it in
13  Turkish?
14  A.     Yeah, it is Turkish.
15  Q.     Okay.  So I have to get a translator?
16  A.     We can do it here.
17         (Indiscernible).
18  Q.     Okay.  That would be great?
19  A.     It's a file maybe like this or something,
20  like this because it is ten years monthly or two
21  months.  Okay?  (Indiscernible).
22  Q.     Okay.  So Mr. Özorhan has the complete file
23  because there were lawyers before him, they gave it
24  to him, right?
25  A.     Yes (indiscernible).

16 (Pages 58 to 61)

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

---

### Page 62

1  Q.   Okay.  So he has a complete file.
2       All right.  Now, getting back to your
3  daughter's home --
4  A.   Yeah.
5  Q.   -- in Turkey, that you lived in -- I
6  apologize.  What period of time did you live in your
7  daughter's home?
8  A.   Before 2014, three years I think.
9  Q.   Three years?
10 A.   Yeah, maybe.  I can hardly remember.
11 Q.   Before moving into your daughter's home,
12 where did you live?
13 A.   Until 2001, I live with my ex-wife home.
14 Okay?
15 Q.   Okay.
16 A.   And after that, I divorce 2002 or something
17 and maybe two years I stayed some apartment or I
18 will check it.
19 Q.   Okay.
20 A.   I don't remember exactly where.
21 Q.   Okay.  So that gets you up to 2003.  And so
22 you had three years at your daughter's before you
23 came to the United States in 2014?
24 A.   Yeah, yeah, three years I stayed, three or
25 four years I stay at my daughter's house.

---

### Page 63

1  Q.   So that takes us back let's say to 2011.
2  So between 2003 and 2011, where did you live?
3  A.   I think I stayed in an apartment, a small
4  apartment I stayed.  Maybe it's here.  Let me see.
5  Maybe.
6       I don't have give the others.  I don't
7  remember exactly.  I stay in an apartment, a small
8  apartment, which is single apartment, which is --
9  which is managed with the company, I stayed there.
10 Then I passed my daughter's house.
11 Q.   Okay.  Now, the company that -- the
12 apartment that you were staying in, was -- did you
13 own that?
14 A.   No.
15 Q.   Did any company in which you have --
16 A.   Oh, no.
17 Q.   -- a legal or equitable interest --
18 A.   No.  I think that apartment also belongs to
19 my daughter, yeah.
20 Q.   The apartment you think belongs to your
21 daughter?
22 A.   Yeah, yeah, yeah.  (Indiscernible).  There
23 is the place, yeah, a small unit.  Then I transfer
24 to my daughter's house.  Maybe that house also my
25 daughter, yeah.  It's an apartment, yeah, not

---

### Page 64

1  company, not me.
2  Q.   So your daughter owns the apartment
3  building?
4  A.   Yeah.
5       MR. CAMPBELL:  Well, when you say
6  building --
7  A.   I will -- I will check it.  I don't know.
8  Q.   Does she own -- I'm sorry -- does your
9  daughter own the building or does she -- (cross
10 talking).
11 A.   No, no, no.
12 Q.   -- just own that one?
13 A.   Small unit, single unit, yeah, yeah.
14 Q.   We both can't talk at the same time.
15 A.   Okay.
16 Q.   Okay.
17      MR. CAMPBELL:  He's got a habit of
18 doing this.  So just be patient.  I know it's hard.
19 BY MR. ATKINSON:
20 Q.   Okay.  So your daughter only owns the one
21 small unit in the building?
22 A.   Yes, yeah.
23 Q.   Okay.
24 A.   But I just remember address and other
25 things.

---

### Page 65

1  Q.   At any time in the ten years before you
2  filed your petition in bankruptcy, did you own any
3  real property?
4  A.   No.
5  Q.   In the ten years before you filed the
6  petition in bankruptcy, did any company in which you
7  had an interest, legal or equitable, beneficial
8  owner or otherwise, own any real estate?
9  A.   Real estate.
10 Q.   Real estate.
11 A.   No.
12 Q.   At any time in the ten years before you
13 filed your petition in bankruptcy, did any company
14 in which you have an interest own any other
15 company --
16 A.   No.
17 Q.   -- that owned any real estate?
18 A.   No, real estate, no.
19 Q.   Did you ever own any real estate in Turkey?
20 A.   No.  Mr. Trustee, after 2001 when the
21 government block everything, personally, I am not
22 able to do anything.  Do you understand what I mean?
23 Because after that period, okay, I don't have a
24 chance to have anything, any apartment, any asset, I
25 cannot do it because of their blockage on me.  Okay?

---

17 (Pages 62 to 65)

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

## Page 66

1  Q.   Now, when they have the blockage on you
2  individually, did that freeze --
3  A.   **Individually because personally I also --**
4       MR. CAMPBELL: Wait. He's going to --
5  A.   **Sorry.**
6  Q.   When they blocked you individually --
7  A.   **Company wise as a partner of the company**
8  **individually.**
9  Q.   Okay. What about your personal assets, did
10 they block them?
11 A.   **Yes, everything.**
12 Q.   Now, when you say block, does that mean
13 they froze your bank accounts?
14 A.   **Froze bank accounts and cash accounts, if**
15 **they want, they can do everything, they can sell my**
16 **property if they want or they can stay, you**
17 **understand what I mean.**
18 Q.   Okay.
19 A.   **But I don't have able to do anything.**
20 Q.   Okay. So when they froze -- strike that.
21       When they blocked you individually --
22 A.   **Yeah.**
23 Q.   -- in 2001 --
24 A.   **'1.**
25 Q.   -- did you have any individual bank

## Page 67

1  accounts that they blocked?
2  A.   **Before that, yeah, maybe, yes, small**
3  **accounts, smaller ones, but yes, maybe smaller ones**
4  **in Turkey.**
5  Q.   Okay.
6  A.   **I don't remember exactly, but not big**
7  **amount I know that because all the companies had the**
8  **assets.**
9  Q.   The companies had the assets?
10 A.   **Yeah.**
11 Q.   So the company --
12 A.   **Personally I don't have anything.**
13 Q.   You didn't have anything, it was all in the
14 companies --
15 A.   **Maybe some small accounts --**
16 Q.   We can't keep doing this.
17 A.   **Okay.**
18       MR. CAMPBELL: Just for the record, I
19 want to note, you have a tape recorder here,
20 correct?
21       MR. ATKINSON: Yeah.
22       MR. CAMPBELL: Who is this?
23       MR. ATKINSON: There's a court
24 reporter to the right that the creditors have asked
25 to come.

## Page 68

1       MR. CAMPBELL: Okay. I object to her
2  interfering with your questioning and your
3  recording. To the extent that happens again, we're
4  going to call the judge.
5       MR. ATKINSON: What do you mean? She
6  hasn't interfered.
7       MR. CAMPBELL: She's done it three or
8  four times. It's not appropriate.
9       MR. ATKINSON: Because two people are
10 talking.
11      MR. CAMPBELL: I agree.
12      MR. ATKINSON: And it is appropriate
13 for a court reporter who's taking something down to
14 say I can't do this.
15      MR. CAMPBELL: This is your -- we have
16 a recording happening. I want to make sure we
17 cooperate with your instructions.
18      I agree with you, my client has done it
19 numerous times. He's inpatient when it comes to a
20 question and he's got to cooperate with you and he
21 can't take over you. He understands that.
22      To the extent the reporter who is not here
23 on your behest is interfering, I'm objecting to
24 that. That's the only thing I'll say.
25      MR. ABRAMOWITZ: If I could just say

## Page 69

1  as the creditor who asked the reporter to be here,
2  it will be more problematic to get it off of a tape
3  if it ever comes to a situation where it has to be
4  transcribed than it would be if you were to follow
5  it up the way it is now to complete a record. So I
6  don't think that we should play the game, and if
7  there is a request by Mr. Campbell or an objection,
8  the judge is upstairs, I'd be happy to go upstairs
9  with you.
10      MR. CAMPBELL: Agreed.
11      MR. ABRAMOWITZ: Okay.
12      THE COURT REPORTER: Can we take a
13 break, please?
14      MR. ATKINSON: Yes.
15      (Recess taken.)
16      MR. ATKINSON: Okay. We had about a
17 10-minute break.
18      MR. CAMPBELL: The tape recorder is on
19 pause.
20      MR. ATKINSON: Oh, thank you.
21      Okay. We just had about a 10-minute break.
22 And I'm going to start again. It's about 11:30,
23 11:32 and I really can't recall the last question
24 that Mr. Cortuk was trying to answer while I was
25 talking.

18 (Pages 66 to 69)

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

**Page 70**

1  So could you read back the last question if
2  you can?
3  (Whereupon the record was read back by
4  the reporter.)
5  BY MR. ATKINSON:
6  Q.  Okay.  So after 2001 when the government
7  blocked all of your companies, you -- you were able
8  to continue all of your companies?  You were able to
9  continue to work for those companies, correct?
10  A.  Yes.
11  Q.  Okay.  But the government -- did the
12  government control the companies at that point?
13  A.  Yes.
14  Q.  Are there any companies remaining that the
15  government has not sold or liquidated?
16  A.  Again, please.
17  Q.  Did all the companies that -- and I'm going
18  to use your phrase --
19  A.  Yeah.
20  Q.  -- that the government blocked, have those
21  companies been sold?
22  A.  Yeah.  Many of them is sold.
23  Q.  Many of them have been sold?
24  A.  Yes, after 2001.
25  Q.  Do you know which companies have not been

**Page 71**

1  sold?
2  A.  I don't remember all of them, but only I
3  can say that one of them is not sold, Bayindir
4  Insaat is not sold yet.
5  Q.  Okay.  That's the construction company?
6  A.  Yeah, some of them is bankruptcy, closed,
7  some of them is sold.  I don't remember which one is
8  closed.
9  Q.  Okay.  So would your attorney know which
10  ones have not been sold?
11  A.  No.  This -- this attorney we gave you --
12  Q.  Mr. Özorhan?
13  A.  -- Özorhan is following the case between us
14  and governmental institute.
15  Q.  Right.
16  A.  He has documents but I don't know what kind
17  of documents in his hand.  Maybe he can answer it or
18  maybe he cannot because he's following a case
19  against them.  Okay?  In that case, it must be, but
20  I'm not so sure about it.
21  Q.  Okay.  And who is paying Mr. Özorhan?
22  A.  While I was Turkey, I tried to pay him, but
23  after that last two, three years, I am not paying
24  him, but he's following because he's friend of me.
25  Last three, four years I'm not paying.  But

**Page 72**

1  every year, one or two session is done.  Okay?
2  Nothing important.  He hasn't taken (indiscernible).
3  Q.  So he's doing it for free?
4  A.  Yeah.  Last three years, I am not paying;
5  four years, I'm not paying.
6  Q.  Do you have any agreement with him that if
7  you get money, you'll pay him?
8  A.  Written, no.  But he's friend of me, but if
9  I earn some money from these sources, I will do
10  something for him, but no written agreement.
11  He worked with us many years, then I left
12  from the country.  He tried to follow it up.  As I
13  told you, every year, one session or two session is
14  done, when how far, one hour, he attend and go back.
15  That's what he's up for now.
16  Q.  Okay.
17  A.  Not (indiscernible).
18  Q.  And before you moved to the United States
19  in 2014, when in 2014 did you come, do you recall?
20  A.  May, May --
21  Q.  May is good.
22  A.  May --
23  Q.  I don't care about the exact date.
24  A.  May, May.
25  Q.  Okay.  So May 2014?

**Page 73**

1  A.  2014, yes.
2  Q.  Okay.  And in the period November 29, 2013
3  to the time you left Turkey, had you paid
4  Mr. Özorhan any money?
5  A.  While I am managing the companies, the
6  companies has a right to pay, you understand?  I --
7  I -- as I remember, he takes money from the
8  companies because the companies is under the counter
9  account, but we can manage some expenses for the
10  lawyers.
11  Q.  Okay.
12  A.  They cannot say anything about it.
13  Q.  Okay.  So that was up until sometime in
14  2013 --
15  A.  Yeah.
16  Q.  -- when the government cancelled the
17  agreement?
18  A.  Yeah.  Until that he -- and he as I
19  remember he takes from the companies.
20  Q.  Okay.
21  A.  After that, he didn't take.
22  Q.  Now, is anyone holding any property in
23  trust for you?  By that I mean any land or
24  buildings?
25  A.  Nothing.

19 (Pages 70 to 73)

USBC, District of NJ     In re Kamuran Cortuck, Debtor     Monday
No. 17-34019-CMG     Rule 341(a) Hearing     April 30, 2018

## Page 74

1  Q.   Is anyone holding any personal property in
2  trust for you?
3  A.   No.
4  Q.   Other than transferring monies to your
5  daughter or son --
6  A.   Umm-hmm.
7  Q.   -- have you transferred any personal
8  property to any other friend or relative or company
9  in which either your son or your daughter are
10 affiliated during the last two years?
11 A.   No.
12 Q.   When I say the last two years, in the two
13 years before November 29, 2017?
14 A.   No, no.
15 Q.   If I was to ask the same question to say
16 within the last year before you filed your petition
17 in bankruptcy, would your answers be the same?
18 Would your answer be the same?
19 A.   Same, yes.
20 Q.   Okay.  Now, in your petition, you indicate,
21 and it's Schedule A/B, in answer to number 3, that
22 you have a 50 percent interest in a 2006 --
23 A.   Yes.
24 Q.   -- Cadillac?
25 A.   Yes.

## Page 75

1  Q.   Who's the other owner of the Cadillac?
2  A.   Mr. Ahmed Surdum.
3  Q.   Ahmed?
4  A.   Surdum, S-U-R-D-U-M, U-M.
5  Q.   Okay.  Ahmed is A-H-M-E-D?
6  A.   Yeah.
7  Q.   And it's S-U-R-D-A-M?
8  A.   Yeah, D-U-M.
9  Q.   D-U-M?
10 A.   Yeah.
11 Q.   Okay.  And who is Ahmed Surdum?
12 A.   Ahmed Surdum is Turkish guy who works Iron
13 Bridge at the same time with me.
14 Q.   Okay.  So he -- you know him did you say a
15 church guy or a --
16 A.   Turkish guy.
17 Q.   Oh, a Turkish guy.  I wrote down church.
18 A.   Turkish guy.
19 Q.   A Turkish guy who worked at Iron Bridge
20 with you?
21 A.   At the same time with me.
22 Q.   And when did you buy that car?
23 A.   Oh, I don't remember exactly date.
24 Q.   How much did you pay for that car?
25 A.   We paid I think -- together we paid 8,000,

## Page 76

1  8,500, something like that.
2  Q.   And where was the car parked?
3  A.   The car is with me now.
4  Q.   Okay.
5  A.   I'm using that car.
6  Q.   Okay.  Why did Mr. Surdum pay for 50
7  percent -- well, strike that.
8       Who paid for the car?
9  A.   We paid together.
10 Q.   You paid together.  Did you pay 50-50?
11 A.   Yeah, 50.
12 Q.   Okay.  Why did Mr. Surdum pay 50 percent of
13 the purchase price of a 2006 Cadillac?
14 A.   Okay.  He and I, at the time I use company
15 cars, which I don't need an additional car, okay.
16 This is hobby car at the time for me because the
17 company gave me a car and I used that car.  And he
18 and I, we like old cars.  Okay?  One day from
19 advertisement, he saw it, a nice car, he summarized
20 it, we went together and we buy together because he
21 also likes old cars.  Okay?  He has enjoyed old
22 cars.
23 Q.   Okay.  Well, but you drive it?
24 A.   I drive, sometimes he drive whenever he
25 wants.  Okay?  We ever friends now.  We are seeing

## Page 77

1  each other ever every three, four weeks.
2  Q.   So is it parked right now at 5 Spy Glass --
3  A.   Yeah, yeah, yeah.
4  Q.   -- or is it parked in the parking lot here?
5  A.   No, no, no.  I came in another car.
6  Q.   So it's parked at 5 Spy Glass?
7  A.   Yeah.  Sometimes he took it.  Then I
8  will like it -- he we join -- he likes it and I like
9  it.
10 Q.   How many times a year does he use it?
11 A.   So, he?
12 Q.   Yeah.
13 A.   Every month, two or three times.
14 Q.   Two or three times a month?
15 A.   Four times.
16      It's parked, I only use two or three times
17 a week -- month because it was a carriage car, a
18 hobby car.
19 Q.   Okay.  And when he uses it?
20 A.   Sometimes he comes and --
21 Q.   Does he come to -- well, you were living at
22 12 Merion; is that correct?
23 A.   Yeah, he can come and he can take it, he
24 can use it.
25 Q.   Okay.  How did he get there?

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

## Page 78

1    A.    His car. He has a car.
2    Q.    He drove his car to get there?
3    A.    Drive his car, yeah.
4    Q.    To drive around the Cadillac?
5    A.    Yeah, sometimes I went to his house and
6    I -- he bring me with his car sometimes, we change.
7    Q.    Okay. Now, from the time you came to the
8    United States in May of 2014 until the time you
9    filed your petition in bankruptcy, you said you had
10    the use of a company car, correct?
11    A.    Yes.
12    Q.    Did you have the use of any other car?
13    A.    I?
14    Q.    Yeah.
15    A.    No, I use company car.
16    Q.    Okay. And that was Iron Bridge
17    Constructors?
18    A.    Yes.
19    Q.    Is it constructors or contractors?
20    A.    Contractors.
21    Q.    Contractors.
22       Okay. And what type of car were you
23    driving?
24    A.    At the beginning, I use Mercedes GL car,
25    Mercedes GL car.

## Page 79

1    Q.    Mercedes JL --
2    A.    GL car, big one.
3    Q.    GL car?
4    A.    Yeah.
5    Q.    Okay. And was that part of your
6    compensation package?
7    A.    Yeah. They gave -- they gave me that car
8    for my personal use.
9    Q.    Did they purchase the car after you came to
10    the United States?
11    A.    No, no, I don't know. It was at hand.
12    It's an old car. It was not a new car.
13    Q.    What year was it?
14    A.    The car?
15    Q.    Yeah.
16    A.    Well, I think car was -- I come 2014, car
17    is four, five years old maybe, 2000, I don't know
18    exactly, I don't remember exactly.
19    Q.    So 2009 or 2010?
20    A.    Maybe. Four, five years or six years old
21    maybe. I don't know. I don't remember. It's not a
22    new car that I know.
23    Q.    Okay. And have you owned any boats?
24    A.    No.
25    Q.    Did you own any boats when you were in

## Page 80

1    Turkey?
2    A.    No. Personally, no.
3    Q.    Did any of your companies own boats in
4    Turkey?
5    A.    Yeah, my companies have boats, yeah, one or
6    two.
7    Q.    Do any of your present companies have
8    boats?
9       MR. CAMPBELL: Objection to form, but
10    go ahead and answer. Answer if you understand.
11    Q.    Do any of your present companies have any
12    boats?
13    A.    Now?
14    Q.    Yeah.
15    A.    No, no, today, no.
16    Q.    Okay. When did they last have boats?
17    A.    Maybe 1996, 1997.
18    Q.    Okay. So a long time ago?
19    A.    Long time ago.
20    Q.    Okay.
21    A.    Before 2001.
22    Q.    Do you own any furniture?
23    A.    Personally, no.
24    Q.    Does any company you have an interest in
25    own any furniture that you use personally?

## Page 81

1    A.    No.
2    Q.    Do you have a computer?
3    A.    No.
4    Q.    Do you have an iPad?
5    A.    I have iPad, small one.
6    Q.    How old is that?
7    A.    I think five, six years old maybe. Not a
8    new one.
9    Q.    And that's the iPad that you use for
10    watching movies?
11    A.    Yes.
12    Q.    Okay. And you don't have --
13    A.    And news from Turkey.
14    Q.    And news from Turkey?
15    A.    Newspaper.
16    Q.    Okay.
17    A.    Yeah.
18    Q.    And you don't have any business records on
19    that?
20    A.    No.
21    Q.    And where is the iPad located right now?
22    A.    I think it's in my home.
23    Q.    That's the one at 5 Spy Glass?
24    A.    Yeah, yeah.
25    Q.    Did you have it when you filed your

21 (Pages 78 to 81)

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

## Page 82

1  bankruptcy petition?
2  A.    Excuse me?
3  Q.    Did you have it when you filed your
4  bankruptcy?
5  A.    Yes, I had it. Since five years, I had it
6  or six years.
7  Q.    Okay. And do you have a cell phone?
8  A.    Yes.
9  Q.    What type of cell phone do you have?
10 A.    AT&T.
11 Q.    No, I mean, what -- is it an Apple --
12 A.    Apple, yeah.
13 Q.    -- is it a Samsung?
14 A.    Apple.
15 Q.    Which model Apple do you have?
16 A.    I think this is 6, 7, something. 7 I
17 think.
18 Q.    Okay. So if it's a 7, you bought it
19 sometime in the last two years?
20 A.    Maybe three years old. I don't remember
21 exactly.
22 Q.    Okay. When did you stop working at Iron
23 Bridge?
24 A.    Last year, June.
25 Q.    June. Why did you stop working?

## Page 83

1  A.    Company become smaller, they had many bids,
2  but they didn't award bids.
3  Q.    Pardon me?
4  A.    They enter many bids --
5  Q.    They entered a lot of bids?
6  A.    -- bid, but they didn't award it and they
7  decided to get smaller.
8  Q.    So were you fired?
9  A.    No, we talk and I said you don't need me I
10 think and they said we become smaller and not fired,
11 but we leave, I leave together, why discussion?
12 Q.    Okay.
13 A.    Not fired, not --
14 Q.    Did a lot of other people leave?
15 A.    Yes.
16 Q.    Did you apply for unemployment insurance?
17 A.    No.
18 Q.    Now, when you were working at Iron Bridge
19 making $10,000 a month --
20 A.    Umm-hmm.
21 Q.    -- bringing home let's say 64, $6,500 a
22 month --
23 A.    Yes.
24 Q.    -- did you pay any of that toward the
25 household expenses?

## Page 84

1  A.    No. I'd spend myself.
2  Q.    Pardon me?
3  A.    I spent --
4  Q.    You spent it yourself?
5  A.    -- myself personally.
6  Q.    Do you have any antiques?
7  A.    No.
8  Q.    Do you have any antiques or collectibles in
9  Turkey?
10 A.    No.
11 Q.    Does any company in which you have a legal
12 or equitable interest own any antiques or
13 collectibles in Turkey?
14 A.    No.
15 Q.    Do they own any oriental rugs?
16 A.    No.
17 Q.    And in your petition and answer to question
18 8, equipment for sports and hobbies, you said no.
19 So you don't have any equipment for sports or
20 hobbies?
21 A.    Shoes.
22 Q.    Shoes.
23       Okay. Do you have any photographic
24 equipment?
25 A.    No.

## Page 85

1  Q.    Do you have any exercise equipment?
2  A.    Maybe some hands on here I try.
3  Q.    Some weights?
4  A.    Yeah, yeah, small weights, two or three
5  maybe.
6  Q.    But you do have golf clubs?
7  A.    Yeah. Only the equipment what I have.
8  Q.    Pardon me?
9  A.    Only the equipment what I have.
10 Q.    That's the only equipment.
11       Okay. So the golf clubs, what type of golf
12 clubs do you have? What's the make? Who makes
13 them? TaylorMade, Titleist?
14 A.    Oh, oh, TaylorMade.
15 Q.    TaylorMade?
16 A.    No. What is other one?
17 Q.    I'll give you some names.
18 A.    Yeah, please.
19 Q.    TaylorMade?
20 A.    No.
21 Q.    Titleist?
22 A.    No.
23 Q.    Callaway?
24 A.    Callaway, yeah.
25 Q.    And when did you purchase them?

22 (Pages 82 to 85)

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

Page 86

1 A. Four years ago or something, four years
2 ago.
3 Q. Have you bought any golf clubs since then?
4 A. Only one last year, one, only one small
5 one.
6 Q. What did you buy? What did you buy?
7 A. I buy iron seven, seven iron.
8 Q. Seven iron?
9 A. Seven iron, yeah.
10 Q. Okay. And where did you buy your Callaway
11 clubs?
12 A. From the club, golf club.
13 Q. That would be Forsgate?
14 A. Yes, Forsgate Golf Club.
15 Q. And your seven iron from Forsgate?
16 A. Yes, yeah, yeah.
17 Q. Do you buy all your golf equipment at
18 Forsgate?
19 A. No. Four years ago, I buy from a shop
20 which is closed now in — somewhere else near my
21 house, not far from my house.
22 Q. Okay. So a retailer?
23 A. Yeah, retailer.
24 Q. Do you have any stamp collections?
25 A. No.

Page 87

1 Q. As a civil engineer, do you have any tools
2 of your trade? What -- what -- like do you have --
3 do you have a CAD system as a civil engineer?
4 A. No.
5 Q. No.
6 A. No, sir.
7 Q. When you do your civil engineering work, do
8 you do it on a computer?
9 A. No. I worked — I (indiscernible) am
10 technically far from those things. Okay? I use my
11 brain, my experience, my knowledge I would say like
12 I am not working any data thing.
13 Q. What type of work did Iron Bridge
14 Construction -- Contractors do?
15 A. They are making bridge, some new bridges,
16 repair some bridges, old bridges, new bridges
17 generally bridge construction.
18 Q. Okay. And did you -- did your son -- did
19 you say your son is no longer involved with Iron
20 Bridge?
21 A. Yeah.
22 Q. And he has sold his interest in Iron
23 Bridge?
24 A. Yes, he left Iron Bridge.
25 Q. Well, he left, but did he sell his

Page 88

1 interest?
2 A. Yes, yeah, he sell it.
3 Q. And would that be in all of the Iron Bridge
4 Companies?
5 A. Yes, as I know. I am not so sure what he
6 did.
7 Q. Do you have a close relationship with your
8 son?
9 A. Yeah, I have close relation, but I am not
10 asking his job, yeah, his personal.
11 Q. And when he sold his house, did he tell you
12 he was selling his house?
13 A. He?
14 Q. Did he tell you he was selling his house?
15 A. Yeah, yeah. I know that he was going to
16 sell the house.
17 Q. Okay. And when he was going to sell his
18 interest in Iron Bridge, did he tell you he was
19 going to sell his interest in Iron Bridge?
20 A. He — the company's not going well. They
21 have problems I know that. After I left problems
22 bigger what I know. They have some problems with
23 the banks also and at the time, he told me that he
24 want to sell and leave because the company's not
25 going well.

Page 89

1 Q. Did he tell you how much he was going to
2 sell it for, his interest for?
3 A. No, I don't know that. But company as I
4 know, company was in a bad position because banks
5 ask some letters, some credits and I don't know
6 details, but they have problems what I know with the
7 banks.
8 Q. Does Westpoint USA have an interest in Iron
9 Bridge?
10 A. Yes.
11 Q. Does it still have an interest in Iron
12 Bridge?
13 A. I don't think so. I don't know because
14 Westpoint is not mine.
15 Q. Westpoint USA is owned by Westpoint UK,
16 correct?
17 A. All I know that, yes. As I know.
18 Q. Have you ever had any communications with
19 any financial directors of or advisors of Westpoint
20 UK?
21 A. No.
22 Q. Have you ever had any communications with
23 any financial advisors or representatives of
24 Westpoint USA?
25 MR. CAMPBELL: Just objection to form,

23 (Pages 86 to 89)

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

### Page 90

1 but you can answer it to the extent you know.
2      THE WITNESS: Hmm?
3      MR. CAMPBELL: Answer it if you can.
4      THE WITNESS: Okay. No.
5 A.   I had -- I don't have any relation with
6 those companies.
7 Q.   Okay. Have you ever owned a gun?
8 A.   In Turkey, yes. In the past, not now.
9 Q.   What happened? Did you own a gun when you
10 moved to the United States, but left it in Turkey?
11 A.   I -- I gave it to the government back.
12 Q.   You gave your guns to the government?
13 A.   Because there is a license there a
14 period --
15 Q.   Right.
16 A.   -- if you don't extend that period, you
17 must give it back. I don't extend it and I give it
18 back.
19 Q.   Okay. And you have some jewelry?
20 A.   No.
21 Q.   You have a Rolex -- the bankruptcy petition
22 says you have a Rolex watch.
23 A.   Yes, I have a watch, yes.
24 Q.   Is that the one you're wearing?
25 A.   Yes.

### Page 91

1 Q.   What type of Rolex watch is it?
2 A.   Oh, I don't know.
3      It's a Rolex. That's what I know.
4 Nothing -- nothing else more.
5      MR. CAMPBELL: Do you want to take a
6 picture of it?
7      MR. ATKINSON: Sure. Yeah.
8 Q.   And when did you buy this Rolex?
9 A.   I think it is maybe more than ten years
10 maybe. It's a long time. (Indiscernible).
11 Q.   Okay. Where did you buy it?
12 A.   In Turkey I think, yeah, in Turkey, yes.
13 Q.   You've been to Switzerland, correct?
14 A.   Sorry?
15 Q.   You've been to Switzerland, correct?
16 A.   I bought it in Turkey. I know, I remember.
17 Q.   Did you ever buy a watch in Switzerland?
18 A.   No.
19 Q.   Now, you're a man who had people -- until
20 your companies were taken over --
21 A.   Yeah.
22 Q.   -- had people do everything for you,
23 correct?
24 A.   Yes.
25 Q.   All right. And then after your companies

### Page 92

1 were taken over, you were still able to operate and
2 pursuant to the agreement with the government of
3 Turkey, correct?
4 A.   Yes.
5 Q.   And so you still had people doing things
6 for you, correct?
7 A.   Yes, yes, until I came here.
8 Q.   Okay. And you had the use of planes when
9 there were planes available?
10 A.   After -- not -- not before -- not after
11 2001. Okay?
12 Q.   Okay. And you had offices all over the
13 world?
14 A.   Yes.
15 Q.   Okay. And the only piece of jewelry you
16 have ever owned --
17 A.   Yes.
18 Q.   -- is your one Rolex watch?
19 A.   Yes.
20 Q.   By the way, have you ever owned a fur coat?
21 Have you ever owned a fur coat?
22 A.   What do you mean?
23 Q.   A fur coat, made of mink or sable or --
24      MR. CAMPBELL: Animal.
25 Q.   -- beaver?

### Page 93

1      MR. CAMPBELL: Animal coat with the
2 fur.
3 Q.   Fur, F --
4      MR. CAMPBELL: We probably should say
5 for the record, you know, his English is clearly his
6 second language and there's some words he just does
7 not get.
8 A.   Is this right here? What do you mean? I
9 can --
10      MR. CAMPBELL: Yes, I see.
11      THE WITNESS: No. In Turkey, mans
12 cannot use this according to tradition.
13      MR. CAMPBELL: For the record, the
14 debtor asked me to use his phone to translate the
15 word into an application on his phone and I typed in
16 fur coat.
17 BY MR. ATKINSON:
18 Q.   Okay. Now according to your petition, at
19 the time you filed the petition, you had $3,000 of
20 cash?
21 A.   Yeah.
22 Q.   Where did you keep the cash?
23 A.   In my pocket.
24 Q.   Okay. What was the source of the cash?
25 A.   From the income which I work in Iron

24 (Pages 90 to 93)

USBC, District of NJ                In re Kamuran Cortuck, Debtor                Monday
No. 17-34019-CMG                    Rule 341(a) Hearing                         April 30, 2018

### Page 94

1  Bridge.
2  Q.    Okay.  And you filed your bankruptcy
3  petition on November 29, 2017, correct?
4  A.    Yes.
5  Q.    You stopped working at Iron Bridge in
6  June of 2017, correct?
7  A.    Yes.
8  Q.    Okay.  So from June until November 29,
9  we're talking five months --
10 A.    Yes.
11 Q.    -- correct?
12       And so that $3,000 was -- your testimony
13 is --
14 A.    I just finished.
15 Q.    -- that's from your working at Iron Bridge?
16 A.    Yes.
17 Q.    Okay.  Why were you keeping it in cash
18 rather than a bank account?
19 A.    Because all of my life, I always use cash
20 also.  In my country, cash is the first payment
21 issued.  Card is not so used.
22 Q.    Well, you used a credit card.
23 A.    We use cards, but our main issue, if you --
24 if you have a businessman, cash is more, how would I
25 say, more prestige to pay cash.  Okay?

### Page 95

1  Q.    Okay.  But you've been in the United States
2  since 2014, correct?
3  A.    Yes.
4  Q.    Most people don't pay with cash; is that
5  correct?
6  A.    Yes, but I'm also using cash now.  So all
7  my life I also use cash here.
8  Q.    Okay.  So when you left your employment at
9  Iron Bridge in June of 2014, or excuse me, 2017 --
10 A.    '17.
11 Q.    -- how much cash did you have on hand?
12 A.    I said $3,000.
13 Q.    Okay.  So from June until November 29, you
14 didn't spend any of that cash?
15 A.    I spent it and I asked some from my son
16 also.  I am using money.  I am living here.  I have
17 some expenses.
18 Q.    Okay.  So let's clarify this.
19 A.    Yeah.
20 Q.    You left Iron Bridge in June of 2017?
21 A.    Yeah.
22 Q.    And had $3,000 of cash, correct?
23 A.    Yes.
24 Q.    Was it exactly 3,000?
25 A.    Yeah, I -- it was 3,000, what I said.

### Page 96

1  Q.    Okay.  And on November 29, 2017, you had
2  $3,000 of cash?
3  A.    Yeah.
4  Q.    Were these in hundred dollar bills, $20
5  bills?
6  A.    I don't know.  Maybe 10 each.  I don't
7  remember.
8  Q.    Do you still have the $3,000 in cash?
9  A.    No, I spent it.
10 Q.    Okay.  So since you filed your bankruptcy,
11 you've spent the $3,000 in cash?
12 A.    After, after I left from the company, yeah,
13 after that I spend, yes.
14 Q.    Okay.  So from December -- from November 29
15 to the present --
16 A.    Yes.
17 Q.    -- you spent that $3,000?
18 A.    Yes.
19 Q.    And was it the original $3,000 that you had
20 been carrying around in your wallet since
21 November -- since June?
22       MR. CAMPBELL:  Just objection to form,
23 but you can answer.
24 A.    Yes.
25 Q.    Okay.  And from June of 2017 until you

### Page 97

1  filed your bankruptcy petition, how were you paying
2  for your expenses?
3  A.    Until bankruptcy, what I have 3,000 because
4  I had more money that comes from my past companies
5  or past boards.  I spent those monies until then.
6  Q.    I'm sorry.  Could you repeat that?
7  A.    Between left from the company --
8  Q.    Right.
9  A.    -- up to October --
10 Q.    Yep.
11 A.    -- okay, I have some money which left from
12 the company account and I spent that money.
13 Q.    Okay.  And was that money in your bank
14 account?
15 A.    Well, maybe, yeah, maybe.
16 Q.    Well, if it wasn't in your bank account,
17 where was it?
18 A.    From company account.
19 Q.    No.  If the money was not in your bank
20 account that you spent, where was the money that you
21 spent?
22 A.    Some with me, some with the bank.  I always
23 have money with me.
24 Q.    I know.  You had $3,000 when you left.
25 A.    Yeah, left.

(856) 983-8484                        Tate & Tate, Inc.                        (800) 636-8283
520 Stokes Road, Suite C-1, Medford, NJ  08055

USBC, District of NJ                In re Kamuran Cortuck, Debtor                Monday
No. 17-34019-CMG                    Rule 341(a) Hearing                         April 30, 2018

### Page 98

1   Q.   Your work --
2   A.   The rest must be — sorry.
3   Q.   You had $3,000 when you left your --
4   A.   Yeah.
5   Q.   -- employment at Iron Bridge?
6   A.   Umm-hmm.
7   Q.   You had $3,000 --
8   A.   October.
9   Q.   In November 29, 2017 --
10  Q.   Sorry. Okay.
11  Q.   -- when you filed your bankruptcy petition?
12  A.   Yes.
13  Q.   From June --
14  A.   Yeah.
15  Q.   -- until November 29, you said you had
16  spent money from your bank account?
17  A.   From my bank account.
18  Q.   Okay.
19  A.   And I — maybe I had some cash also.
20  Q.   Okay. So maybe you had some other cash in
21  addition to the 3,000?
22  A.   Before that, yes. When I left the company,
23  maybe I had — I don't remember what amount of cash,
24  what amount in the bank. But some — some of them
25  is at the bank I know.

### Page 99

1   Q.   Okay. When you were paid by Iron Bridge --
2   A.   Yes.
3   Q.   -- were you paid by direct deposit by Iron
4   Bridge into your account?
5   A.   Yes, to my account.
6   Q.   Okay. Did they ever pay you cash?
7   A.   I don't remember. All I remember, they
8   paid directly, but maybe -- maybe sometimes they
9   paid. I don't remember, it was four years ago.
10  Q.   Well, how about in the year before you
11  filed your bankruptcy petition, did they pay you any
12  cash?
13  A.   I don't think so. I'm not so sure, but I
14  don't think so.
15  Q.   Did they pay you any money directly rather
16  than through a -- through the bank account, writing
17  you a check?
18  A.   No.
19  Q.   Before you moved to the United States, did
20  you have any bank accounts in Turkey?
21  A.   No. Can't be.
22  Q.   Pardon me?
23  A.   Can't be.
24  Q.   Can't be?
25  A.   Because of the --

### Page 100

1   Q.   The block?
2   A.   Right. I cannot open an account and I
3   cannot put money in there.
4   Q.   Did any company in which you had an
5   ownership interest still have a bank account in
6   Turkey?
7   A.   They had, but they're working.
8   Q.   Now, do you have any bank accounts in
9   England?
10  A.   No.
11  Q.   Did you have any bank accounts in Wales?
12  A.   No.
13  Q.   Let me back that up.
14       Did any company in which you have a
15  beneficial interest own any bank -- have any bank
16  accounts in England?
17  A.   No.
18  Q.   Did any company in which you have a
19  beneficial interest have any bank accounts in Wales?
20  A.   No.
21  Q.   Did any company in which you have a
22  beneficial interest ever have any accounts in Malta?
23  A.   Malta can be because some of the Swiss
24  company have some companies behind of them in Malta.
25  Q.   Some of the Swiss companies?

### Page 101

1   A.   Yeah. That means I am not personally have
2   an account in Malta. Maybe the companies who might
3   have, I'm not so sure, but maybe they will have.
4   Q.   And what companies do you have in
5   Switzerland?
6        MR. CAMPBELL:  Just objection to form,
7   but go ahead and answer.
8   A.   Four or five companies I have there.
9   Q.   What four or five companies do you have in
10  Switzerland?
11  A.   Please ask again.
12  Q.   What four or five companies do you have in
13  Switzerland?
14  A.   I have companies there doing job there.
15  Q.   What are the names of the companies?
16  A.   Oh, names. I can't — I don't remember
17  exactly.
18  Q.   You don't remember the names of your
19  companies?
20  A.   Yeah, yeah. There's four or five but I
21  don't remember. But in this court case everything's
22  into there, all the companies, everything's into
23  there. Also the agreement which we done behind of
24  it, all the companies there also. It is not secret,
25  but I don't remember.

26 (Pages 98 to 101)

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

## Page 102

1  Q.   The four or five companies in Switzerland
2  that you have an interest in -- strike that.
3       The court case in Switzerland is over,
4  correct?
5  A.   Finished, yeah.
6  Q.   And when you talk about the court case,
7  that was the criminal proceeding with a related
8  civil proceeding?
9  A.   That is civil -- civil case and there is
10 also a case which prosecutor opened. The
11 prosecutors work on that -- -- but he didn't open a
12 case against me, he decided that I am not guilty.
13 If he finds me guilty, he will take me to another
14 court, criminal court, but he didn't do it and he
15 decided that I am not guilty.
16 Q.   Well, when you say he decided you are not
17 guilty, who decided?
18 A.   Prosecutor decided.
19 Q.   And what's his name?
20 A.   Muscato (phonetic).
21 Q.   Muscato?
22 A.   Yes, Mr. Muscato.
23 Q.   And when you say he decided you were not
24 guilty, you mean he decided not to charge you?
25 A.   Not to charge me.

## Page 103

1  Q.   There was never a trial?
2  A.   No. He didn't open a trial against me.
3  Q.   Okay.
4  A.   He make -- he look over the case and then
5  (indiscernible) he said you are not guilty.
6  Q.   Okay. Now the four or five companies --
7  A.   Yeah.
8  Q.   -- that you had in Switzerland, did they
9  have bank accounts?
10 A.   They had bank accounts, but prosecutor
11 collect all the money to escrow agency. That means
12 there is no bank account now. All of them's closed.
13 Today there is none.
14 Q.   Do you have any interest in any publicly
15 traded stock? Do you know what I mean by publicly
16 traded?
17 A.   Yes. I don't have.
18 Q.   Okay. Do you have any stock interest,
19 partnership interest --
20 A.   No.
21 Q.   -- membership interest --
22 A.   No.
23 Q.   -- in any nonpublic company?
24 A.   No.
25 Q.   Do you have a pension?

## Page 104

1  A.   In Turkey, I am retired from Turkey.
2  Q.   So you receive a pension from the
3  government of Turkey?
4  A.   Yes, social insurance, Social Security
5  system give me every month, every -- it change every
6  time because sometimes they increase, but I remember
7  just now less than 2,000 Turkish lira or around
8  2,000 Turkish lira, that means it is $500 per month,
9  approximately, roughly.
10 Q.   Okay.
11 A.   Change according to --
12 Q.   And does Turkey do it -- well, do they send
13 you a check or do they just wire it into a bank
14 account?
15 A.   Yeah, they sent -- they put on -- on my
16 name to an account and I authorize somebody that in
17 Turkey they will take and use that.
18 Q.   Okay. And where is that account located?
19 A.   Istanbul.
20 Q.   And what's the name of the financial
21 institution in which it's deposited?
22 A.   I don't remember, but I can give you that.
23 Q.   Okay. So you'll get me the name --
24 A.   Okay.
25 Q.   -- of the bank? When I say --

## Page 105

1  A.   I will give you --
2  Q.   Wait, wait. When I say you'll get me the
3  name of the bank, you'll get it to Mr. Campbell --
4  A.   Okay.
5  Q.   -- who will get it to me?
6       MR. CAMPBELL:  I've got it.
7  A.   Okay.
8  Q.   The name of the bank in Turkey where your
9  monies are deposited.
10 A.   Yeah.
11 Q.   And who would you authorize to take money
12 out of that bank?
13 A.   Okay. I will also give (indiscernible).
14 Q.   No. I'm asking you who have you authorized
15 to take out --
16 A.   Maybe my daughter. I don't know. I don't
17 know.
18 Q.   Well, if it's not your daughter, who is it?
19 A.   I don't know. I will -- I will give you
20 information which bank and who is authorized. Okay?
21 Because it is so small amount (indiscernible). It's
22 not very important money.
23 Q.   And what, does your daughter send you the
24 money?
25 A.   No, it may be spent for something for my

27 (Pages 102 to 105)

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

**Page 106**

1  needs there because --
2  Q.    What needs do you have in Turkey?
3  A.    Legal expenses and something like that.
4  Q.    Well, I thought you weren't paying your
5  legal expenses in Turkey.
6  A.    I'm not paying it, except maybe for stamp
7  duties, you understand, so some -- something, maybe
8  business. As I told you, just $5,000 per month,
9  something like that.
10  Q.    Okay. And how long have you been receiving
11  Social Security?
12  A.    Maybe last ten years.
13  Q.    Ten years?
14  A.    Umm-hmm.
15  Q.    Has it -- has it always been deposited in
16  the same bank?
17  A.    It must be, yes.
18  Q.    Okay. So it's been coming in to that bank
19  since you came to the United States the last four
20  years?
21  A.    Sorry?
22  Q.    So you've been getting about $6,000 a
23  year --
24  A.    Yeah. I never took any money because they
25  spent it. I never touch it.

**Page 107**

1  Q.    Okay. Do you own any annuities?
2  A.    No.
3  Q.    Do you have any life insurance with a cash
4  value?
5  A.    No. I had $1 million.
6  Q.    And that was the account that -- that was
7  the insurance policy that was utilized to fund the
8  settlement in Switzerland?
9  A.    Yes.
10  Q.    And who authorized using that money? Did
11  you have to authorize it?
12  A.    According our agreement --
13  Q.    Right.
14  A.    -- which we done, escrow agency, we decided
15  the BTR side, Romania side --
16  Q.    Right.
17  A.    -- an escrow agency with the control of
18  prosecutor, that agency, escrow agency collect all
19  the money.
20  Q.    I realize they collected it, but did you
21  have to authorize the insurance company to send them
22  the money?
23  A.    Yeah, I authorize.
24  Q.    Okay. Now, did you --
25  A.    Not the insurance be authorized. We accept

**Page 108**

1  according agreement, the prosecutor can do on behalf
2  of us to collect all the money to the escrow agent.
3  Q.    Okay. So the prosecutor collected it?
4  A.    He did it.
5  Q.    Okay. Did you have to give anything to the
6  prosecutor to enable him to get the money from
7  Credit Suisse for the insurance company policy?
8  A.    We sign -- we sign an agreement with BTR
9  together and we submit this agreement to prosecutor.
10  Q.    Okay. And that's all he needed to get the
11  money out of the insurance policy from --
12  A.    Yeah, yeah. He will do everybody, the
13  cash, the polices and other cash annuity collect in
14  an escrow account.
15  Q.    Okay. When you say he ordered everybody,
16  you mean all the banking institutions?
17  A.    Right, banking institutions and all the
18  money which is blocked, all the accounts.
19  Q.    And was Dominion your financial advisor at
20  that point?
21  A.    Yes, they are -- yes, they were working for
22  us at that time.
23  Q.    And is Dominion affiliated with Credit
24  Suisse?
25  A.    Dominion, they don't have a relation with

**Page 109**

1  my health insurance, they are not -- this is out of
2  their (indiscernible) book.
3  Q.    And when you say health insurance, do you
4  mean life insurance?
5  A.    Life insurance. There is no lien in
6  Dominion. The companies they manage and those
7  companies have some sources.
8  Q.    Okay. Now, when Dominion was managing your
9  financial affairs, did you have direct contact with
10  Dominion?
11  A.    Yeah, sometimes.
12  Q.    Did you contact them by e-mail?
13  A.    No, by face-to-face.
14  Q.    Face-to-face?
15  A.    Yeah.
16  Q.    Where was Dominion located?
17  A.    At the time, they were -- they have many
18  branches, but I met them in their branch in Geneva.
19  Q.    In Geneva?
20  A.    In Geneva.
21  Q.    Geneva?
22  A.    Geneva.
23  Q.    And when did you last meet them in Geneva?
24  A.    I think the last time when I met them is
25  the time what we are going to sign the agreement

28 (Pages 106 to 109)

Tate & Tate, Inc.
(856) 983-8484
520 Stokes Road, Suite C-1, Medford, NJ  08055
(800) 636-8283

USBC, District of NJ                    In re Kamuran Cortuck, Debtor                    Monday
No. 17-34019-CMG                        Rule 341(a) Hearing                              April 30, 2018

---

### Page 110

1  (indiscernible), same days.
2  Q.  Okay.  That would be the prosecutor's
3  agreement for the settlement?
4  A.  Yes.  The agreement which is done between
5  me and BTR, at the time I was in Geneva and at the
6  time I was (indiscernible).
7  Q.  Okay.
8  A.  After that I didn't saw them.
9  Q.  Okay.  So after 2016, you have not seen --
10  A.  No.
11  Q.  -- you have not been to Dominion?
12  A.  No, no, I never saw them.
13  Q.  In Geneva?
14  A.  No, and after that, I didn't go there.
15  That was my last trip.
16  Q.  Okay.  Did -- how many times a year would
17  you meet with representatives of Dominion in
18  Switzerland?
19  A.  While I was in America --
20  Q.  Yeah.
21  A.  -- I was -- as I remember, I saw them three
22  times or something like that.
23  Q.  Okay.
24  A.  That means between 2014 up to 2017, I met
25  them two or three times.  Not more.  Always in

### Page 111

1  Geneva.
2  Q.  And when you would meet them in Geneva,
3  would anyone accompany you to the meeting?
4  A.  I don't remember, maybe.  I was there, but
5  I don't know who is with me.
6  Q.  Do you remember going to the meeting all by
7  yourself?
8  A.  No.  Sometimes I was with somebody, but I
9  don't remember, maybe with my lawyers in Geneva, I
10  have some lawyers there, maybe I went with them
11  maybe.  I'm not so sure.
12  Q.  Okay.
13  A.  I have lawyers there, a company.
14  Q.  Are they -- do you have lawyers on a
15  retainer there or are these the lawyers who are --
16  strike that.
17  Do you have lawyers on a retainer in
18  Geneva?
19  A.  Yes.  In this problem, I make a special
20  agreement with the company and I work only for them,
21  with them.
22  Q.  What company were you working for?
23  A.  Geneva Law Company.
24  Q.  Geneva Law Company?
25  A.  Yeah.

### Page 112

1  Q.  And how much did you pay them?
2  A.  I don't remember exactly, but I paid them
3  maybe 300,000 or something.
4  Q.  Do you have any financial records
5  indicating or business records indicating how much
6  you paid them?
7  A.  Yeah, my -- my daughter paid them and she
8  has all the documents, what she sent them and she
9  took back those monies from those accounts.  Because
10  of that we have reports.
11  Q.  She took back money?
12  A.  What I received at then.  We had 50
13  hundred, 60 she paid.  She paid 280, but she took
14  250 or something.  Not -- not the exact amount, less
15  than -- she took 30,000 less than....
16  Q.  Okay.  And that was in May of 2000 or in
17  March of 2017?
18  A.  Yes, yes, spend the money.
19  Q.  Over what period of time did she pay the
20  lawyers the $300,000?
21  A.  This case, beginning in 2014 as I remember,
22  not so sure about it, maybe 2013.  From that day up
23  to then, she paid it, she paid those monies.
24  Q.  So approximately 2014 to 2016, '17?
25  A.  Yeah, '17 to March or something.

### Page 113

1  Q.  Okay.
2  A.  Less than $300,000 as an amount.
3  Q.  Was your daughter obligated to make those
4  payments --
5  A.  No.
6  Q.  -- or did she just do it?
7  A.  I asked help from her.  She did it because
8  she knows that at (indiscernible), I will take some
9  money and I will pay it back and I did it.  I think
10  I have --
11  Q.  So you paid her back with your money?
12  A.  Yes, only I didn't pay her 250,000 less,
13  because at that time, we calculate that amount, 250,
14  60 something because he checked last two years
15  period, but in the court in UK, he asked all the
16  files from bank, he check only two years, but before
17  two years, he find one more payment, 30.  Because of
18  that she didn't receive.  She understands later on
19  that she paid 30,000 more because of UK case.
20  Q.  Okay.
21  A.  UK case, they ask the documents and she
22  checked the documents.  He told me that 30,000 is
23  less.  I said that one day I have I will pay also
24  that.
25  Q.  Okay.  Was there a loan agreement between

---

Tate & Tate, Inc.
(856) 983-8484                    520 Stokes Road, Suite C-1, Medford, NJ  08055                    (800) 636-8283

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

## Page 114

1   you and your daughter --
2   A.   No, no.
3   Q.   -- was there anything in writing where
4   you --
5   A.   No.
6   Q.   -- agreed to pay her back?
7   A.   Verbally, yes.
8   Q.   Verbally?
9   A.   Yes. In our country, according to our
10  (indiscernible) or according to family basis,
11  written things cannot be done inside the family.
12  This is -- this is our culture. We never do it.
13  Nobody do it. I know it is strange for you, but in
14  our country, just like that.
15  Q.   Did you ever send your daughter an e-mail
16  saying please pay my legal fees?
17  A.   I called. I never used -- as I told you, I
18  am not typing, I can't. I call him and I tell him
19  to do it.
20  Q.   No, who did you call?
21  A.   My daughter.
22        MR. CAMPBELL:   He uses him sometimes
23  when he means her.
24        MR. ATKINSON:   Okay.
25        MR. CAMPBELL:   Yes.

## Page 115

1   BY MR. ATKINSON:
2   Q.   Okay. So you called your daughter and said
3   pay my legal fees?
4   A.   And sometimes she comes here. I also told
5   her verbally here. She comes to visit me every
6   twice, two, three --
7   Q.   Twice a year?
8   A.   Sometimes twice, sometimes three times, but
9   every year he comes once. We generally talk by
10  face-to-face. We make our strategy together.
11  Q.   Do you ever do any Facetime with her on
12  your phone?
13  A.   No. If I say -- if I say that I don't use
14  any Face time, maybe you cannot understand, but it's
15  not my thing.
16  Q.   Okay. Other than meeting with the people
17  at Dominion, I think you said two or three times --
18  A.   Yes.
19  Q.   -- in Geneva, did anyone on your behalf
20  meet people -- meet the financial advisors at
21  Dominion in Geneva?
22  A.   I met them three or four times. Sometimes
23  I am with my lawyers. I don't remember who attended
24  to me because this is a long time ago.
25  Q.   Understood.

## Page 116

1   A.   Yeah.
2   Q.   Well, when -- in the time between
3   meetings --
4   A.   Yes.
5   Q.   -- the two or three times that you met with
6   them, during that -- when you weren't meeting with
7   them, was someone else ever meeting with them on
8   your behalf?
9   A.   Yeah, somebody always, but I don't remember
10  who, what and when or which time. I don't remember.
11  Q.   Well, who would you authorize to discuss
12  your financial affairs with at Dominion?
13  A.   One of colleagues, one of my colleagues,
14  Mr. Bora.
15  Q.   B-O-R-A?
16  A.   B-O-R-A, Özerman, O-Z-E-R-M-A-N, Özerman.
17  Q.   Okay. So it's O-Z-E-R-M-A-N?
18  A.   M-A-N, yeah, yeah.
19  Q.   Okay. And who is Bora Özerman?
20  A.   He was my old worker, he worked with me
21  when I was at management of the companies. Then
22  they establish a company with the friends as a
23  consultant company. He had me whenever I need as a
24  company, but personally also, same thing. He's the
25  guy in UK prosecutor who is -- who has the UK case.

## Page 117

1   Q.   He's been released in the UK?
2   A.   Yeah, released in the UK case, but as I
3   know, now it is finished now, he's --
4   Q.   Okay. So you authorized Mr. Özerman to --
5   A.   Not authorized. Authorize means you must
6   give a document. No. Verbally I ask him to pull
7   over. He's not authorized, he cannot sign, he
8   cannot order, you understand, he informed me. He
9   told me, he called me and asked what is my idea --
10  Q.   Okay.
11  A.   -- then he will tell my idea to them, then
12  they prepare a paper if they need. Okay. And then
13  I come, I sign it.
14  Q.   Okay. So you would sign it only --
15  A.   He's consultant me, he is not authorized,
16  authorized is different.
17  Q.   Okay. So he was your consultant?
18  A.   Yeah, not authorized.
19  Q.   Okay. And as your consultant, was he able
20  to direct Dominion to do anything?
21  A.   No, he's not authorized to order anything
22  to them.
23  Q.   Was he authorized -- strike that.
24        Was he authorized to direct NWT to do
25  anything?

(856) 983-8484

Tate & Tate, Inc.
520 Stokes Road, Suite C-1, Medford, NJ  08055

(800) 636-8283

USBC, District of NJ                      In re Kamuran Cortuck, Debtor                        Monday
No. 17-34019-CMG                               Rule 341(a) Hearing                        April 30, 2018

Page 118

1    A.    No.
2    Q.    Was he ever authorized to do anything on
3    behalf of any company in which you had an interest?
4    A.    No.
5    Q.    Did he ever send you e-mails as to what he
6    was doing?
7    A.    No, no. By phone.
8    Q.    Now, you have a trust, a Lichtenstein trust
9    according to your petition?
10   A.    Yes.
11   Q.    Is that the Tempest Foundation?
12   A.    Tempest, one of the companies Tempest,
13   yeah.
14   Q.    Okay. And my understanding is that in
15   Lichtenstein --
16   A.    Yeah.
17   Q.    -- a trust is known as a foundation; is
18   that correct?
19   A.    Yes.
20   Q.    Okay. And when did you establish Tempest?
21   A.    I don't remember. More than -- more than
22   seven, six, maybe eight years ago maybe, I don't
23   know. I don't remember exactly.
24   Q.    And you were the founder of Tempest,
25   correct?

Page 119

1    A.    Yes.
2    Q.    And you were also the beneficial owner of
3    Tempest?
4    A.    Yes.
5    Q.    And did someone manage Tempest for you in
6    Lichtenstein?
7    A.    Same company, same company.
8    Q.    Dominion?
9    A.    Yeah.
10   Q.    And why did you form Tempest?
11   A.    They advised me to establish a foundation
12   there, but we didn't do anything that I think it is
13   established and it has not worked. There is no --
14   nothing done in there.
15   Q.    Who advised you to start a foundation?
16   A.    I think Dominion or NYT before. I don't
17   know which one.
18   Q.    And just so we're clear, when you say NYT,
19   you mean NWT?
20   A.    NWT, yes. Well, I don't know which one,
21   but one of them.
22   Q.    Okay. And what was Tempest originally
23   funded with? What were its assets?
24   A.    No assets. Only if there is a bank
25   account, maybe there is a bank account

Page 120

1    (indiscernible), but I don't remember and it must be
2    very minimum amount. It does not work, it is a
3    existing company let us say.
4    Q.    Okay. So what does Tempest -- what did
5    Tempest do?
6    A.    That they propose me to establish a
7    foundation because (indiscernible) these are the
8    companies, Tempest can be the head of those things,
9    okay. You will be here, these companies. You
10   understand? They put steps there.
11   Q.    Okay. So where did Tempest do its banking?
12   A.    I don't -- it must be Dominion's hand. Any
13   bank, maybe they took a bank account. I don't
14   remember. Because this company never vote, this is
15   an umbrella company let us say.
16   Q.    Okay.
17   A.    Okay? Maybe they have account, maybe they
18   don't have, but if they are account, Dominion
19   managed those accounts.
20   Q.    Okay.
21   A.    All the things in Switzerland managed by
22   those companies.
23   Q.    Okay. Well, this was a Lichtenstein trust.
24   Was its bank accounts in Switzerland?
25   A.    If there is an account, it must be there,

Page 121

1    but I don't know. I don't remember.
2    Q.    Okay. Did you get records of the Tempest
3    account?
4    A.    No, no.
5    Q.    Did you ever ask for records of the bank
6    account?
7    A.    When I visit them, they will show me some
8    papers and they will throw it later. Okay? I never
9    collect any account.
10   Q.    When you say when you visited them, you
11   mean when you visited Credit Suisse --
12   A.    No, no.
13   Q.    -- in Geneva?
14   A.    In -- no, not Credit Suisse, I'm talking
15   about Dominion.
16   Q.    Okay. When you visited Dominion in
17   Geneva --
18   A.    Yeah.
19   Q.    -- they would show you the documents?
20   A.    The documents. I never took it because it
21   is not -- if you took it in Turkey, if you
22   understand what I mean, the (indiscernible)
23   otherwise, it would be a problem.
24   Q.    Did you have any individual bank accounts
25   in Switzerland?

31 (Pages 118 to 121)

USBC, District of NJ                In re Kamuran Cortuck, Debtor                      Monday
No. 17-34019-CMG                    Rule 341(a) Hearing                             April 30, 2018

|  | Page 122 |
|---|---|
| 1 | A.    For my name? |
| 2 | Q.    Yes. |
| 3 | A.    No. |
| 4 | Q.    In the last ten years, have you had any |
| 5 | individual accounts in Lichtenstein? |
| 6 | A.    No. |
| 7 | Q.    Have you had any individual accounts in the |
| 8 | Cayman Islands? |
| 9 | A.    No.  Only individual account is my life |
| 10 | insurance; the other things, all the company, not |
| 11 | personally. |
| 12 | Q.    Okay.  So when you earned money, it just |
| 13 | stayed in the company's bank account? |
| 14 | A.    Yes. |
| 15 | Q.    From the period November 29, 2013 to |
| 16 | November 29, 2017, did you have any monies deposited |
| 17 | into your business, your company accounts |
| 18 | that belonged -- the monies that belonged to you? |
| 19 | A.    Can you say date again? |
| 20 | Q.    From November 29, 2013 -- |
| 21 | A.    Umm-hmm, 2013. |
| 22 | Q.    -- to November 29, 2017. |
| 23 | A.    Oh. |
| 24 | Q.    In those four years? |
| 25 | A.    No. |

|  | Page 124 |
|---|---|
| 1 | Q.    So from November 29, 2007 and the time you |
| 2 | came to the United States -- |
| 3 | A.    2014 you mean. |
| 4 | Q.    No, from November 200 -- November 29, 2007 |
| 5 | until May 2014 when you came to the United States, |
| 6 | did you have any bank accounts, individual bank |
| 7 | accounts in Turkey? |
| 8 | A.    No. |
| 9 | Q.    Did you have any company accounts in Turkey |
| 10 | that had any money? |
| 11 | A.    Yes, but those companies are not mine after |
| 12 | 2001. |
| 13 | Q.    Then why would you put your money into |
| 14 | those companies? |
| 15 | A.    Not my money.  The company has money.  I |
| 16 | don't have any money, no. |
| 17 | Q.    Okay.  So from 2007 until you moved to the |
| 18 | United States and started working for Iron Bridge, |
| 19 | did you earn any money? |
| 20 | A.    From the companies whom I manage, I take |
| 21 | money -- |
| 22 | Q.    Okay. |
| 23 | A.    -- salary basis. |
| 24 | Q.    And where did you deposit it? |
| 25 | A.    I use it.  I don't have bank account |

|  | Page 123 |
|---|---|
| 1 | Q.    In those four years, did you have any money |
| 2 | on deposit in those company accounts? |
| 3 | A.    No, personally, no. |
| 4 | Q.    You say all the money you received went |
| 5 | into company accounts? |
| 6 | A.    Yes. |
| 7 | Q.    Okay.  So you did not receive any money |
| 8 | from 2013, November 2013 to November 29, 2017? |
| 9 | A.    No. |
| 10 | Q.    What about in the period November 29, |
| 11 | 2007 -- |
| 12 | A.    2007. |
| 13 | Q.    -- 2007 to November 29, 2017, did you have |
| 14 | any money that belonged to you deposited in any of |
| 15 | your company bank accounts? |
| 16 | A.    No. |
| 17 | Q.    So from November 29, 2007 to November 29, |
| 18 | 2017, you didn't have any money in any of your |
| 19 | company accounts, correct? |
| 20 | A.    No. |
| 21 | Q.    And did you have any bank accounts |
| 22 | personally in any country anywhere in the world -- |
| 23 | A.    In America, yes. |
| 24 | Q.    -- other than in Turkey and in America? |
| 25 | A.    No.  Only America I had the account. |

|  | Page 125 |
|---|---|
| 1 | because I cannot open bank account.  I take it and I |
| 2 | spend it. |
| 3 | Q.    So the companies that you were working for? |
| 4 | A.    Yeah. |
| 5 | Q.    Did they pay you in cash? |
| 6 | A.    Yes. |
| 7 | Q.    Do you have a record of the cash payments |
| 8 | that you received from November 29, 2013 until you |
| 9 | moved to the United States in May of 2014? |
| 10 | A.    I don't have any bank account. |
| 11 | Q.    No.  Do you have any records of how much |
| 12 | cash you were receiving? |
| 13 | A.    Oh, no, I don't have. |
| 14 | Q.    Is there income tax paid in Turkey? |
| 15 | A.    Yes. |
| 16 | Q.    Do you have to report cash that you |
| 17 | received even (overtalking). |
| 18 | A.    If I have cash, I must report it. |
| 19 | Q.    Did you file tax returns in Turkey? |
| 20 | A.    I don't remember.  Maybe I didn't or maybe |
| 21 | my people did. |
| 22 | Q.    Where -- who were your people? |
| 23 | A.    People means the company, employees who |
| 24 | works for me. |
| 25 | Q.    Would they have filed your individual bank |

32 (Pages 122 to 125)

USBC, District of NJ          In re Kamuran Cortuck, Debtor          Monday
No. 17-34019-CMG                  Rule 341(a) Hearing               April 30, 2018

Page 126

1  account -- strike that -- your individual tax
2  returns?
3  A.    If I am obliged to do it, they must do it
4  there for me, but I don't remember exactly what I
5  did.
6  Q.    Wouldn't you have to sign the returns?
7  A.    I don't remember.
8  Q.    Well, in Turkey, do people have to sign tax
9  returns?
10 A.    Well, I think your people can do it on
11 behalf of you.  You are not -- the company people
12 can do it on behalf of you I think.  You don't need
13 to sign those.  If the company pays you some money,
14 they can do it for you.
15 Q.    So am I correct in saying --
16 A.    Maybe I didn't take money.  I don't
17 remember.  Personally, I don't remember.  But my
18 daily uses is I spend it.  Okay.  If you ask me to
19 take money, I don't remember, but my needs is done
20 by them because I am working for them.
21 Q.    Your need is done by them?
22 A.    Yes.
23 Q.    So the company paid all of your expenses?
24 A.    Yeah, which is need -- the company, not --
25 not, example, travel expenses, other expenses.  I

Page 127

1  never use cash, that was if I need cash for my
2  personal use.
3  Q.    Okay.  Well, for instance, if you were
4  going to fly on an airplane --
5  A.    Then they would buy ticket and everything.
6  Q.    They bought the ticket for you?
7  A.    Right.  Hotel expenses, everything done by
8  them.
9         MR. CAMPBELL:  I believe it's a good
10 time to take a break soon.  What do you think?
11        MR. ABRAMOWITZ:  Why don't we -- why
12 don't we just finish Schedule A/B --
13        MR. CAMPBELL:  Okay.  Whatever you
14 think.
15        MR. ATKINSON:  Which we're almost done
16 with anyway.
17        MR. CAMPBELL:  Okay.  Are you good?
18 All right.
19 BY MR. ATKINSON:
20 Q.    So between the time from 2007 until the
21 time you came to the United States, did you have a
22 bank account in Turkey?
23 A.    No.
24 Q.    And if you were paid, you were paid in
25 cash, correct?

Page 128

1  A.    Yes.
2  Q.    And do you recall how much you were making
3  from the companies in Turkey?
4  A.    No, there was no amount, which because I
5  tried to take those companies back.  I am not
6  working on a salary base, I am spending effort.
7  Q.    Okay.  Then how did you support yourself?
8  A.    They are paying all my expenses.
9  Q.    So if you went to a restaurant for
10 dinner --
11 A.    Right, they paid, everything was paid.
12 Q.    -- was it on a credit card?
13 A.    Or they can pay from the company directly.
14 Q.    Well, when you go into a restaurant -- I'm
15 just using an example.
16 A.    Okay.
17 Q.    When you go into a restaurant --
18 A.    Yes.
19 Q.    -- you order a meal, right?
20 A.    Yes.
21 Q.    At the end of the meal, you have to pay for
22 the meal?
23 A.    Yes.
24 Q.    Okay.  How would the company pay for that
25 meal?

Page 129

1  A.    We are one of the biggest company.  When
2  they make a regimen for a restaurant, generally I am
3  the (indiscernible) and I bill this, they sent the
4  bill around to the company only to pay at the same
5  time because I am not going alone.
6  Q.    Okay.  So if you weren't going out on a
7  business function with members of the company --
8  A.    Yeah.
9  Q.    -- you didn't go to restaurants?
10 A.    Personally you mean?
11 Q.    Yes.
12 A.    Yeah, sometimes I paid cash.
13 Q.    Okay.  And that was the cash that the
14 companies gave you?
15 A.    Yeah.
16 Q.    Okay.  Now, since the companies were under
17 the -- I'll use the word "control," they were
18 blocked, did the government care how much cash you
19 paid yourself?
20 A.    No, they are not asking.
21        MR. CAMPBELL:  Just objection to the
22 form of that question, but he answered.  I
23 understand the answer.
24 BY MR. ATKINSON:
25 Q.    Did anyone ever complain about how much

33 (Pages 126 to 129)

USBC, District of NJ                In re Kamuran Cortuck, Debtor                Monday
No. 17-34019-CMG                        Rule 341(a) Hearing                  April 30, 2018

Page 130

1  cash you were taking out?
2      A.    Trust me, those companies was mine and they
3  give me a chance to bring them back. And I never
4  ask any money for myself. I work for them to take
5  my companies back.
6      Q.    I understand.
7      A.    That was that kind of relation.
8      Q.    I understand that.
9          But you said you took cash out of the
10 companies.
11     A.    (Indiscernible).
12     Q.    What I was asking you —
13     A.    Yeah.
14     Q.    — did the government ever complain —
15     A.    No.
16     Q.    — about the cash?
17     A.    No, they trust us and they believe that
18 they — they control a big way, you understand, they
19 are not into the details.
20     Q.    Okay. Other than the bank account at Bank
21 of America —
22     A.    Umm-hmm.
23     Q.    — which you sent me records from —
24     A.    Yes.
25     Q.    — that I subpoenaed, have you had any

Page 131

1  other bank accounts in the United States?
2      A.    Before Bank of America, I had another bank.
3  Then it is closed and I transferred this bank.
4      Q.    What was the name of that bank?
5      A.    I don't remember. It is not very big one.
6  It's a small bank.
7      Q.    I'm going to ask you to get me the name of
8  that bank.
9      A.    Okay. I will send my lawyer the name and
10 the time when I used that bank.
11     Q.    And the account number, please.
12     A.    Okay. I will do.
13         MR. CAMPBELL: I got it.
14         MR. ATKINSON: Now would be a good
15 time to stop.
16         MR. CAMPBELL: Sounds good.
17         MR. ATKINSON: Thank you.
18         (Discussion off the record.)
19         (Luncheon recess.)
20         MR. ATKINSON: Okay. This is the
21 first meeting of creditors of Kamuran Cortuk. It is
22 now 1:35. It's a continuation on from this morning.
23 We took a break for about 50 minutes.
24 BY MR. ATKINSON:
25     Q.    Mr. Cortuk, you're still under oath.

Page 132

1      A.    Yes.
2      Q.    Okay?
3          Now that you don't have a company car, when
4  you are needing to drive someplace and you don't use
5  the 2006 Cadillac the two or three times a month,
6  what car do you drive?
7      A.    Until I left from company, for my personal
8  use —
9      A.    Yep.
10     A.    — I used Cadillac around my home.
11     Q.    Okay.
12     A.    Okay. Then I need to go somewhere else, my
13 son pick.
14     Q.    Okay. Your son drives you?
15     A.    Yeah.
16     Q.    Okay.
17     A.    I don't rent so far.
18     Q.    Okay. So you don't have the use of another
19 car right now —
20     A.    No.
21     Q.    — other than your Cadillac?
22     A.    No.
23     Q.    Now, there was some testimony regarding
24 Dominion this morning and you said you met with them
25 two or three times?

Page 133

1      A.    As I remember.
2      Q.    And you don't have any e-mails directly to
3  them, correct?
4          Did you pose questions to your daughter to
5  ask of Dominion?
6          MR. CAMPBELL: Objection to form, but
7  answer the best you can.
8      A.    My — I use my friend what I mentioned you.
9  He makes these things.
10     Q.    Bora Özerman?
11     A.    Yeah. (Indiscernible).
12     Q.    So he would make the inquiries. If you had
13 something you wanted to say to Dominion —
14     A.    He would —
15     Q.    — you would communicate it to Mr. Özerman
16 who would communicate it to Dominion; is that
17 correct?
18     A.    Yeah, yes.
19     Q.    Okay. And then Mr. — Dominion would
20 communicate with Mr. Özerman?
21     A.    Yes.
22     Q.    And he would communicate with you?
23     A.    Yes.
24     Q.    Were the communications between Dominion
25 and Mr. Özerman by e-mail?

34 (Pages 130 to 133)

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

| Page 134 |
|---|

1  A.   I have no idea.
2  Q.   Well, Credit Suisse is -- was located in
3  Geneva, correct?
4  A.   Yes.
5  Q.   And was Mr. Özerman in Istanbul?
6  A.   Credit Suisse Özerman have never had any.
7  Q.   I'm sorry. Dominion -- I misspoke.
8  Dominion was located in Geneva; is that correct?
9  A.   Yes, yes.
10  Q.   And Mr. Özerman was located in Istanbul?
11  A.   Yes.
12  Q.   Okay. Do you know whether or not
13  Mr. Özerman communicated with Dominion by e-mail?
14  A.   I don't know.
15  Q.   Did Mr. Özerman ever provide you with
16  copies of any e-mails that he had with Dominion?
17  A.   No. He would inform me what is the result
18  of it.
19  Q.   He would just tell you by telephone?
20  A.   Yeah, yeah, by phone.
21  Q.   Or on occasion you met him?
22  A.   Or sometimes I met him.
23  Q.   Now, how many times a year would you go
24  back to Turkey?
25  A.   Last -- last three or four years, I never

| Page 135 |
|---|

1  went, but they -- I met them in Switzerland also
2  when I over there.
3  Q.   Okay. So you've never gone back to visit
4  your daughter?
5  A.   No, no, daughter is coming here.
6  Q.   Your daughter, she comes here?
7  A.   Yeah.
8  Q.   How old is Yisim?
9  A.   Yisim is born in 1977. That means 40.
10  Q.   41.
11  A.   41.
12  Q.   Well, she's 40 or she's 41 depending on
13  when her birthday is?
14  A.   (Indiscernible).
15  Q.   Depending on when her birthday is.
16  A.   Yeah, she's 7 -- 41 now.
17  Q.   Okay.
18  A.   January was her birthday.
19      MR. CAMPBELL: Yeah, it's on.
20  Q.   Now, so was Bora Özerman the only one who
21  would contact Dominion on your behalf?
22  A.   Yes.
23  Q.   Okay. Now, with regard to the Lichtenstein
24  trust, we'll call it the foundation, Tempest --
25  A.   Yeah.

| Page 136 |
|---|

1  Q.   -- did you communicate directly with the
2  directors of Tempest?
3  A.   No.
4  Q.   Did Mr. Özerman -- strike that.
5      Did you ask Mr. Özerman to contact the
6  directors of Tempest?
7  A.   I don't remember, but we never used
8  Tempest. Tempest is only an umbrella company.
9  Q.   Okay.
10  A.   I don't think it is needed. I don't
11  remember, but...
12  Q.   Tempest did have bank accounts; is that
13  correct?
14  A.   Maybe. I don't know, maybe they don't
15  have. Because it's an umbrella company. I don't
16  know why they established it and I don't know if we
17  use it -- if we use it or not. I think we don't use
18  it yet.
19  Q.   You don't use it yet?
20  A.   I don't think. At that time, no. It is
21  also in hand of prosecutor, it is its own system.
22  Q.   Right.
23  A.   All the companies is under hand of
24  prosecutor. Okay?
25  Q.   Okay. When you say in the hands of the

| Page 137 |
|---|

1  prosecutor, you're talking about the Swiss
2  prosecutor?
3  A.   The Swiss prosecutor.
4  Q.   Okay. But the Swiss prosecutor isn't
5  involved with any of the companies any longer; is
6  that correct?
7  A.   Can you ask again?
8  Q.   The Swiss prosecutor --
9  A.   Yeah.
10  Q.   -- is no longer involved with any of the
11  companies --
12  A.   Yes.
13  Q.   -- anymore, is he?
14  A.   Yes.
15  Q.   Why is he involved with the companies
16  still?
17  A.   He's not anymore. It is finished.
18  Q.   Okay.
19  A.   He finished the agreement, the money is
20  taken and sent everybody.
21  Q.   Okay.
22  A.   And now -- and also Dominion left from the
23  companies. Today the companies is nonsense.
24  Q.   Okay. Did you know Mr. Zindel?
25  A.   Zindel?

35 (Pages 134 to 137)

USBC, District of NJ                    In re Kamuran Cortuck, Debtor                    Monday
No. 17-34019-CMG                        Rule 341(a) Hearing                             April 30, 2018

| Page 138 | Page 140 |
|---|---|
| 1  Q.    Z-I-N-D-E-L. | 1  Q.    -- correct? |
| 2  A.    I don't remember.  Who is? | 2  A.    Here, yes. |
| 3  Q.    Okay.  Did you ever speak with Yisim to ask | 3  Q.    Okay.  Is there a separate agreement about |
| 4  her to contact Dominion on your behalf? | 4  the appeal? |
| 5  A.    Zindel. | 5  A.    No, he's my lawyer here, maybe -- I don't |
| 6  Q.    No, did you ever ask your daughter Yisim -- | 6  think if we have some additional -- I don't |
| 7  A.    Okay. | 7  remember. |
| 8  Q.    -- to contact Dominion on your behalf to | 8  Q.    Has anyone made payments to him on your |
| 9  discuss Tempest? | 9  behalf, for the services he's rendering to you? |
| 10  A.    No, I don't think so.  I don't remember, | 10  A.    No.  My daughter at the beginning paid as |
| 11  but I don't think so. | 11  you know and then I don't pay anything. |
| 12  Q.    Did you ever authorize Yisim to act on your | 12  Q.    I know you haven't paid anything for the |
| 13  behalf to discuss any of your companies with | 13  bankruptcy. |
| 14  Dominion? | 14  A.    No. |
| 15  A.    No. | 15  Q.    I'm asking about for this -- Mr. Campbell |
| 16  Q.    Did Yisim ever contact you by telephone or | 16  and his law firm are representing you in things that |
| 17  by e-mail to advise you of recommendations that | 17  were not the original bankruptcy petition? |
| 18  Dominion made to her?  Strike that.  Let me rephrase | 18  A.    Yes. |
| 19  that. | 19  Q.    Is your daughter paying him for that? |
| 20      Did Yisim ever contact you by writing, | 20  A.    First of all, I must remember that I don't |
| 21  e-mail, in person or by telephone to advise you of | 21  have an agreement or not with him.  But I don't |
| 22  recommendations that Dominion made regarding your | 22  remember if I don't have an agreement or not.  My |
| 23  financial affairs? | 23  daughter has agreement with him -- |
| 24  A.    My financial affairs? | 24  Q.    Okay. |
| 25  Q.    Yeah. | 25  A.    -- for his needs and he's paying for it.  I |

| Page 139 | Page 141 |
|---|---|
| 1  A.    No. | 1  know that.  But that covers me or not, I don't |
| 2  Q.    Did Yisim ever contact you by writing, by | 2  remember.  I don't know. |
| 3  e-mail, by telephone or in person to advise you of | 3  Q.    Okay. |
| 4  any recommendations that Dominion had made regarding | 4  A.    I don't have -- I don't find any link that |
| 5  any of the companies in which you had an interest? | 5  he must also pay additional money for him for my |
| 6  A.    No. | 6  case. |
| 7  Q.    Now, Tempest -- well, I'll strike that. | 7  Q.    Okay.  Does your son, Sirkan -- |
| 8  We'll get back to that. | 8  A.    Yeah. |
| 9      Regarding what has been going on here in | 9  Q.    -- is paying any legal fees for you |
| 10  this bankruptcy, do you have a new retainer | 10  after the bankruptcy petition was filed for the work |
| 11  agreement with Mr. Campbell's law firm for all of | 11  that Mr. Campbell is doing for you? |
| 12  the work it's doing for you postpetition?  By | 12  A.    No. |
| 13  postpetition, I mean after you filed your | 13  Q.    Do you have any agreement with Yisim that |
| 14  bankruptcy. | 14  she will pay for your legal fees postpetition?  By |
| 15  A.    I think maybe -- I know this whole | 15  postpetition, I mean after November 29. |
| 16  bankruptcy, I made an agreement.  But -- | 16  A.    I don't have an agreement. |
| 17  Q.    Yes. | 17  Q.    Okay. |
| 18  A.    -- I don't remember -- | 18  A.    At the beginning, he asked me some amount, |
| 19      MR. CAMPBELL:  If you don't remember, | 19  I don't have amount and I ask for and she sent it. |
| 20  you don't remember. | 20  That's all. |
| 21  A.    I don't remember, do I have something more | 21  Q.    Okay.  And do you have any agreement with |
| 22  or not.  Maybe, I don't know. | 22  Sirkan that he is going to pay for your legal fees |
| 23  Q.    Okay.  Well, he's representing you in | 23  for all the matters that are associated with this |
| 24  appeal -- | 24  bankruptcy that have occurred after the November 29 |
| 25  A.    Yeah. | 25  date? |

36 (Pages 138 to 141)

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

### Page 142

1   A.      I don't have any agreements with my son.
2   Q.      Okay.  And, Mr. Cortuk, at the time in
3   December when you filed your original schedules, you
4   listed no secured creditors.  Do you know what a
5   secured creditor is?
6   A.      No.
7   Q.      Okay.  A secured creditor would be a
8   financial institution, usually maybe a bank that has
9   a lien on something that you own.  For instance, if
10  you owned real property, and you owned the bank
11  money and they had a mortgage on your property, that
12  would be a secured creditor.
13  A.      I don't have it.
14  Q.      You don't have it.
15      And you filed an amendment to your petition
16  on April 27, 2018 and that didn't change; is that
17  correct?
18  A.      Yes.
19  Q.      Okay.  Now, you also at the time you filed
20  your petition in bankruptcy listed in Schedule E/F:
21  Creditors Who Have Unsecured Claim, and you listed
22  the Internal Revenue Service and the amount was
23  unknown.  What did you think you owed the Internal
24  Revenue Service?
25  A.      I'm sorry.  I don't understand your

### Page 143

1   question.
2   Q.      Okay.  You've listed the Internal Revenue
3   Service --
4   A.      Yeah.
5   Q.      -- as being owed money, you checked the box
6   taxes and certain other debts you owe to the
7   government and the amount you put down as unknown.
8   What taxes do you owe?
9       MR. CAMPBELL:  Objection.
10  A.      After I left last year from the company --
11  Q.      Yeah.
12  A.      -- I think after that only a tax can appeal
13  or not.  I don't know it.  Maybe because of the
14  (indiscernible) said we don't know it
15  (indiscernible) the picture.
16  Q.      Okay.  So do you believe that you owe money
17  to the Internal Revenue Service?
18  A.      No, I don't think so.
19  Q.      Okay.  And in your schedule -- you didn't
20  delete them on your list when you -- on your
21  Schedule E/F when you refiled -- not refiled --
22  excuse me -- you amended your petition on
23  April 27th, you still listed them.  Why did you
24  still list them?
25  A.      Maybe my tax issue did not finalize yet.  I

### Page 144

1   don't know.  Maybe -- because I left the company in
2   middle of the season --
3   Q.      Umm-hmm.
4   A.      -- and after that, maybe it is not
5   finalized yet, the documentation maybe, because of I
6   put it and I don't know when it comes or not.
7   Q.      Okay.  Did you file your 2017 income tax
8   return with the Internal Revenue Service?
9   A.      I think we asked extension for it I think.
10  Q.      Okay.
11  A.      We filed for an extension as I remember.
12  Q.      Could you send me a copy of the extension,
13  please?
14      And do you expect to receive a refund for
15  the year 2017?
16  A.      I don't think so.
17  Q.      Okay.  Do you understand if there is a
18  refund for 2017, that it's an asset of this
19  bankruptcy and you have to let me know about it?
20  A.      Yes.
21  Q.      And you have to amend your petition to
22  include it?
23  A.      If I have, I must, I inform you.
24  Q.      Okay.  And if you file -- when you -- not
25  if.  When you file your 2017 income tax return,

### Page 145

1   please send a copy to me.  Okay?
2       On the next page, you've listed State of
3   New Jersey Division of Taxation and the notations
4   are the same as for the IRS.  Do you believe you owe
5   any money to the State of New Jersey Division of
6   Taxation?
7   A.      I don't think so.
8   Q.      Okay.  And did you get an extension for
9   filing your New Jersey federal income tax -- not
10  federal -- New Jersey state income tax return?
11  A.      I don't know, but I must ask my people who
12  is doing my report about it.  Maybe they ask
13  extension at the same time for the other money.  Do
14  you know what I mean?
15  Q.      Okay.  Now, who are you people?
16  A.      My son is checking these details.  He's
17  doing for me.
18  Q.      Okay.  Do you have an accountant?
19  A.      No, but my son is doing it.
20  Q.      Your son does it?
21  A.      Yes.
22  Q.      Okay.
23  A.      I will ask him what the last occasion.  I
24  don't know exactly.
25  Q.      Okay.  And do you understand that if you

(856) 983-8484

Tate & Tate, Inc.
520 Stokes Road, Suite C-1, Medford, NJ  08055

(800) 636-8283

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

## Page 146

1  get a tax refund from the State of New Jersey for
2  2017 that those are an asset of the debtor estate
3  and must be revealed in your bankruptcy petition and
4  either claimed as exempt or turned over to me?
5  A.    Okay.
6  Q.    Okay? And if there's an extension for New
7  Jersey, please send me a copy of that extension --
8  A.    Okay.
9  Q.    -- and when you file your tax return, send
10 me a copy of your tax return. Okay?
11 A.    Okay.
12 Q.    The next creditor that is listed in the
13 original and in the amended is Banco Turco Romana SA
14 for $134,000,000 and it says the debt was incurred
15 on May 25, 2012. Why do you say May 25, 2012?
16 A.    I think the court decision is that time as
17 I remember. They have a court decision in Romania.
18 I think it is that date --
19 Q.    Okay.
20 A.    -- as I understand, as I remember.
21 Q.    So you think that's when they got a
22 judgment against you in Romania?
23 A.    Yes, I think, yes.
24 Q.    Okay. And you list that as disputed.
25 A.    Yeah.

## Page 147

1  Q.    Okay. Now, did you file an appeal of that
2  judgment?
3  A.    Mr. Trustee, I had an appeal in European
4  human right association against them. It's not
5  finalized yet. This is one. The second thing is in
6  Romania, they take a decision, they take a decision
7  while I never have a chance to defense myself. They
8  take decision on behalf of me. They never called
9  me, they never ask me, they never used the ways what
10 they must follow up.
11     Example, in Turkey and Romania there's a
12 legal agreement, legal court agreement. Okay?
13 According to that, normally while the court is going
14 on in Romania, they must call -- they must call
15 Turkey according to the agreement, they must ask my
16 defense. And after that they must defy it, take
17 decision. They didn't do this. It's a big issue
18 for me because I am a Turkish citizen. If tomorrow
19 they can come to Turkey, in the Turkish court, I can
20 finish their -- I can cancel their decision because
21 I didn't have a chance to defense myself.
22 Q.    Okay. Now, when the judgment -- when you
23 became aware of the judgment in Romania --
24 A.    Yeah.
25 Q.    -- did -- it was Gabriel blowing his horn.

## Page 148

1      When you became aware of the judgment in
2  Romania, did you file an appeal with the Romanian
3  courts?
4  A.    My lawyers did it. Okay? They appeal it.
5  They lost it.
6  Q.    Okay.
7  A.    Okay. And decision is taken.
8  Q.    Okay. And when was your appeal lost?
9  A.    I think this date is just finished.
10 Q.    That's the December 25, 2012 --
11 A.    Yeah, yeah.
12 Q.    Date is you think the date?
13 A.    Yeah.
14 Q.    The appeal was lost?
15 A.    Yeah, lost, yeah.
16     MR. ABRAMOWITZ: Excuse me. Is that
17 December or May?
18     MR. ATKINSON: I'm sorry. May 25,
19 2012.
20 Q.    Now, when you say your attorneys, were you
21 paying your attorneys in Romania?
22 A.    At that time, yes. I paid it at the time.
23 Q.    And what accounts did you use to pay the
24 attorneys in Romania?
25 A.    I don't remember. I don't know. I paid

## Page 149

1  them, but I think if you're asking 2005, hmm?
2  Q.    No, the appeal was over in 2012.
3  A.    Okay. Seven, five, six years ago.
4  Q.    Okay. So were you --
5  A.    We have some companies in Romania at that
6  time also. Maybe they paid. I don't remember.
7  Q.    Okay. So do you have a record of what was
8  paid --
9  A.    No.
10 Q.    -- to the Romanian attorneys?
11 A.    No, I don't have.
12 Q.    You had an attorney in Switzerland also?
13 A.    Yes.
14 Q.    Did you pay him?
15 A.    My daughter pay. I didn't pay.
16 Q.    Do you know how much your legal fees were
17 in Switzerland?
18 A.    I told you this morning, roughly 300,000
19 something. I don't remember. 300,000 something.
20 Q.    Now, in England, did you have attorneys?
21 A.    No, in England, I didn't defense myself. I
22 didn't have attorneys there.
23 Q.    And the only attorney you have in Turkey is
24 Mr. Özorhan?
25 A.    I have some more, but for other things,

USBC, District of NJ                    In re Kamuran Cortuck, Debtor                    Monday
No. 17-34019-CMG                        Rule 341(a) Hearing                           April 30, 2018

| Page 150 | Page 152 |
|---|---|

**Page 150**

1  maybe I have some more.  I don't know.  Because in
2  Turkey, you can't have -- you can't get give
3  authorization to a lawyer.  If you don't cancel it,
4  it's paid.
5  Q.    Okay.
6  A.    You always give a general —
7  Q.    Well, other than Mr. Özorhan, has any
8  attorney performed any legal services for you or any
9  company that you're associated with in the last four
10  years?
11  A.    Last four years.
12  Q.    Let me change that.
13       From November 29, 2013 --
14  A.    Yeah.
15  Q.    -- to November 29, 2017?
16  A.    I didn't pay any money to any attorney in
17  Turkey.
18  Q.    That isn't what I asked.  I asked have any
19  attorneys other than Mr. Özorhan been performing any
20  services for you or for any company in which you
21  have an interest --
22  A.    I don't think so.
23  Q.    -- in Turkey.
24       Now, other than the appeal in Romania that
25  you lost and the appeal to the European human

**Page 152**

1  myself.  I didn't defense myself.  Between the
2  agreements between two countries have a condition
3  saying that, the guy, the person who decided you are
4  guilty must have a right to defense themselves.
5  Q.    Okay.
6  A.    I didn't do it.  And they didn't come and
7  they will never come.  I'm so sure and for that
8  reason, I am not -- I am waiting them.  2002, 2011,
9  over six years passed, huh, they find -- in
10  Switzerland, they find no (indiscernible) they're
11  fighting the whole world, but they are not coming
12  Turkey because they also know that, with that
13  decision, then they come to Turkey to not
14  (indiscernible).
15  Q.    Okay.  Well, that would be looked -- trying
16  to overturn the judgment that they obtained, is that
17  correct, or it obtained?
18       MR. CAMPBELL:  No, I don't think
19  that's what he's saying.
20  A.    What do you mean, the question?
21  Q.    You were sued, correct?
22  A.    Yes.
23  Q.    You didn't file an answer?
24  A.    In Turkey, they didn't come.
25  Q.    No, no.  Let's go back to Romania.

| Page 151 | Page 153 |
|---|---|

**Page 151**

1  rights -- is it commission or court?
2  A.    Court.
3  Q.    Court.
4       Have you filed any other appeals regarding
5  the Romanian judgment?
6  A.    No.  The reason why I didn't make appeal
7  it, I'm still an officer okay?  Normally.
8  Q.    Right.
9  A.    After that decision, after 2012, Romanian
10  government must come to Turkey and ask -- they must
11  ask from our government, okay, to finalize the
12  decisions of the court.
13  Q.    Okay.
14  A.    But they didn't do it.  I wait then in
15  Turkey, if they come to Turkey, I will let them
16  there because in the system in Turkey, according
17  agreement in two countries, when Romania side come
18  to Turkey, they open a court case in Turkey and I
19  will defense myself there.  I make the attempt to
20  come back because I am so sure in Turkey this case
21  will be finalized.  This is not work because the
22  main case between -- the agreement between two
23  countries, the main item is the side, that means I
24  must defense myself in one way, by the help of
25  Turkish government or personally I must defense

**Page 153**

1  A.    Yes.
2  Q.    Okay.  In Romania, you were sued?
3  A.    Yes.
4  Q.    By the liquidator, correct?
5  A.    Yes.
6  Q.    The liquidator got a judgment?
7  A.    Yes.
8  Q.    You appealed the judgment?
9  A.    In Romania.
10  Q.    In Romania?
11  A.    Yeah.
12  Q.    And you lost?
13  A.    Yes.
14  Q.    All right.  If they came to Turkey --
15  A.    They didn't came.
16  Q.    Wait, wait.  No, no.
17       If they come to Turkey with the judgment,
18  does that give you the opportunity to defend the
19  judgment?
20  A.    Yes.
21  Q.    Okay.  But the opportunity to defend the
22  judgment doesn't mean you don't owe them money, is
23  that correct, or do you say you don't owe anything
24  to the bank?
25  A.    I didn't owe personally any penny from the

39 (Pages 150 to 153)

USBC, District of NJ                    In re Kamuran Cortuck, Debtor                    Monday
No. 17-34019-CMG                           Rule 341(a) Hearing                          April 30, 2018

Page 154

1   bank as a person.
2   Q.    Okay.  Do any companies in which you were
3   involved with --
4   A.    Companies --
5   Q.    -- previously owe money to the bank in
6   Turkey -- excuse me -- in Romania?
7   A.    Some of the companies have some debt to the
8   bank in Romania.
9   Q.    Do you know which companies?
10  A.    Bayindir Insaat example.
11  Q.    Pardon me?
12  A.    Bayindir Construction.
13  Q.    Bayindir?
14  A.    Yeah, example.
15  Q.    Okay.  Any others besides Bayindir?
16  A.    I don't remember.  But I think only
17  Bayindir.
18  Q.    Would you have any records to show which
19  companies owed money to Bayindir -- I mean strike
20  that -- owed monies to the bank in Turkey?
21  A.    Again?
22  Q.    Do you have any business records -- I'm
23  sorry -- any business records, anything in writing
24  that would enable you to discover which of your
25  companies owed money to the bank in Romania?

Page 155

1   A.    I think only Bayindir Insaat.
2   Q.    Only.  Okay.
3         And do you have records that show that only
4   Bayindir owes money?
5   A.    As I remember, yes.  Only Bayindir.
6   Q.    That's what you remember?
7   A.    Yes.
8   Q.    What I'm asking is do you have any
9   writings --
10  A.    I don't have --
11  Q.    -- any records that would show who owes the
12  money?
13  A.    I don't have anything.
14  Q.    Okay.  Now, were you on the board of
15  directors of the bank?
16  A.    In Romania --
17  Q.    Yes.
18  A.    -- there is two kind of board members in
19  the banking system.
20  Q.    Okay.
21  A.    One, the law of Romania says that the bank
22  members must live in Romania or Romanian citizen.
23  Q.    Okay.
24  A.    They are only the members who take
25  decision, who can sign the agreement.  Okay?  And

Page 156

1   additionally, there is non boards members who can
2   attend meetings, who can listen on behalf of the
3   owners.  Okay?  I am one of them.  That means non
4   board member of both.  If I want, I can go and I be
5   listening to them.  But as authorization, according
6   law, I don't have any right to take any decision, I
7   don't have any right to sign any document except
8   board member.
9   Q.    Okay.
10  A.    Non board -- there is a system.  You can be
11  ten people, but let us say five people is only
12  responsible, but main condition, they must be
13  citizen of Romania or they must live in Romania.  I
14  never be citizen of Romania.  I never live in
15  Romania.
16  Q.    Okay.
17  A.    For that reason, I am not -- according to
18  law, I am not member of board.
19  Q.    Now, did you own any shares of stock in the
20  bank?
21  A.    No.  Personally, I was shareholder, one
22  percent or something.
23  Q.    One percent?
24  A.    Or something, yes.
25  Q.    How many -- how many shares does one

Page 157

1   percent represent?
2         MR. CAMPBELL:  Objection to form.
3   What are you asking for?
4   Q.    You said you owned one percent of the
5   shares of the bank in Romania; is that correct?
6   A.    Yeah, yeah, it belongs to me.
7   Q.    How many shares is that or was that?
8   A.    I think a hundred shares, (indiscernible) a
9   hundred something I'm only one person.  And it may
10  be less than one percent.  I don't remember exactly.
11  Q.    Okay.  Was Bayindir a shareholder of the
12  bank?
13  A.    Yes, yes.
14  Q.    And what percentage of the bank did
15  Bayindir own?
16  A.    Bayindir and Bayindir Holding is the
17  share -- the owners of the bank, both of them.
18  Q.    They own the bank?
19  A.    Yeah.
20  Q.    No one else owned the bank, just you and
21  Bayindir?
22  A.    And three or four people who has minimal
23  shares like me --
24  Q.    Okay.
25  A.    -- one percent.  Some other partners have

40 (Pages 154 to 157)

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

## Page 158

1 one percent.
2 Q. Okay. So Bayindir would have owned over 95
3 percent Insaat --
4 A. Bayindir and Bayindir Insaat and Bayindir
5 Holding. I don't know which one --
6 Q. Okay.
7 A. -- how many. I don't remember, but they're
8 partners.
9 Q. Okay. And in Bayindir Holding, were there
10 any other entities other than Bayindir Insaat?
11 A. Bayindir Holding is also partners at the
12 same time many companies, but I don't remember how
13 many.
14 Q. Okay. Well, it was an umbrella over the
15 company, right?
16 A. Umbrella, yes. Some of them, in some of
17 the companies, they will be shareholders, some of
18 them not. That means they are not always in a
19 shareholders. According to company needs or
20 biggest, some of them vary in size, some of them
21 not.
22 Q. Okay. And who were the shareholders of
23 Bayindir Insaat?
24 A. Bayindir Insaat shareholders, we have five
25 people.

## Page 159

1 Q. How many shares -- strike that.
2 What percentage of Bayindir Insaat did you
3 own?
4 A. 23, 22, something like that. Change
5 according -- according to capital. I don't remember
6 exactly. But not less than 20, not more than 30.
7 Between that, I don't remember exactly the figures.
8 We have five shareholders.
9 Q. And were you on the board of directors of
10 Bayindir Insaat?
11 A. I am member of board in Bayindir Insaat.
12 Q. Are you still a member of the board?
13 A. In fact, the company's in the hand of
14 government. Now they are -- they are day-to-day
15 people. I am not now.
16 Q. Okay.
17 A. I don't have any relation now.
18 Q. Okay. Have you had any relation with
19 Bayindir Insaat since 2001 when the Turkish crisis,
20 financial crisis took place and the government
21 blocked your shares?
22 A. Yes. What was question? 2001, they
23 blocked -- yeah.
24 Q. Have you had any involvement --
25 MR. ATKINSON: Could you read back the

## Page 160

1 question, please? Thank you.
2 (Whereupon the record was read back by
3 the reporter.)
4 A. Until 2001, I am the shareholder of
5 Bayindir and I am the member of the board. After
6 that, no.
7 Q. Okay. Were you still a shareholder even
8 though the government took over the or blocked the
9 company?
10 A. Because it is so complicated issue, there
11 is no sample in the world you can recognize. After
12 crisis, Turkish government established an institute,
13 which there is no sample in the world. Okay.
14 Q. Okay.
15 A. Example, you can't say treasury, you can't
16 say central bank, associations of the bank. You
17 can't find a name. If they establish a company,
18 they establish an owner to the institute. Only
19 after the crisis, they have a right to take all the
20 shares to sell anybody, they can manage the company,
21 they took all from -- company from us, they blocked
22 everything and they do whatever they do.
23 Q. Okay.
24 A. They sell some of the companies without
25 asking us because according that law, there is no

## Page 161

1 way in the world same like that. We complain about
2 it many times. This isn't legal, this is not the
3 law, but it's something special for that reason.
4 You cannot understand what I mention about it.
5 Okay? This is an official institute.
6 Q. Okay. Have all of your shares in Bayindir
7 Insaat been sold by the government?
8 A. It's taken by them.
9 Q. I understand that.
10 A. Yeah. If they want to sell, they can sell
11 it or some of them sold maybe. I don't know.
12 Q. Are the shares in your name or in the
13 government's name?
14 A. When they block it according to law. The
15 shares is there.
16 Q. Okay.
17 A. Okay?
18 Q. Just according to law?
19 A. According to law. It's a special law.
20 Q. And then from 2001 to when they I'm going
21 to use the word breached the agreement, you think
22 they breached it --
23 A. Yes.
24 Q. -- cancelled the agreement --
25 A. Yeah.

41 (Pages 158 to 161)

USBC, District of NJ      In re Kamuran Cortuck, Debtor      Monday
No. 17-34019-CMG      Rule 341(a) Hearing      April 30, 2018

## Page 162

1  Q.     -- you were still working at Bayindir
2  Insaat to try and recover it?
3  A.     To recover it.
4  Q.     And did you have a title at Bayindir
5  Insaat?
6  A.     Until 2013, they block all our shares, all
7  our rights, but according the agreement which we did
8  with them, according to their agreement which can
9  give us a chance to do something --
10  Q.     Right.
11  A.     -- limited basis, we did it on behalf of
12  company, they give our rights to us to manage the
13  company --
14  Q.     Right.
15  A.     -- but within their limits.  They said that
16  you cannot open accounts, you cannot transfer money,
17  or you ask money.  Do you understand?  If I needed
18  money, we will inform you we ask.  If you have tax,
19  you must -- same thing, they daily, they come in
20  every week or every ten days, they come and check
21  what's going on.
22  Q.     Okay.  Is Bayindir Insaat still blocked by
23  the government?
24  A.     Yes.
25  Q.     Now, when you applied for your green card

## Page 163

1  to be a permanent resident alien of the United
2  States, did you do that in Turkey?
3  A.     Yeah, I did in -- yeah, I applied in
4  Turkey, yes, I take from Ankara.
5  Q.     Okay.  Okay.  So when you got the -- when
6  you got the green card, is that when you came to the
7  United States?
8  A.     Yes.
9  Q.     Okay.
10  A.     I took it I think 2000 -- December of 2013,
11  but I came to country in May of '14 after some
12  months.
13  Q.     Okay.  And when you -- and you haven't been
14  back to Turkey since?
15  A.     No.
16  Q.     Okay.  And do you expect to go back to
17  Turkey?
18  A.     I have an idea to go back because my mom is
19  98 years old, and then I get to worry, example, ask
20  counsel that let us finish this, I will go because
21  she's not health is not so --
22  MR. CAMPBELL:  His mother is elderly
23  and dying.
24  MR. ATKINSON:  If she's 98.
25  MR. CAMPBELL:  He wants to try to go

## Page 164

1  back.
2  A.     An example, I finish this maybe second day
3  I will go, maybe I will not come here some months.
4  I don't know.
5  Q.     Okay.  Now when you came to the United
6  States, did you -- strike that.
7  When you applied for your permanent
8  resident alien green card --
9  A.     Yes.
10  Q.     -- did you know you were going to be living
11  with your son?
12  A.     Yes.
13  Q.     Okay.  And between 2013 when you applied
14  for your green card and the time you moved to the
15  United States in 2014, did you ship over any of your
16  personal property to Sirkan's home so that it would
17  be here in the United States for you?
18  A.     Any personal property?
19  Q.     Yeah.  Anything that you owned.  Did you
20  have --
21  A.     My clothes and some of my needs, I
22  transferred.  I come here literally with luggage.
23  Q.     Okay.  So the only thing you brought from
24  Turkey --
25  A.     Yeah.

## Page 165

1  Q.     -- is your luggage?
2  A.     Yes.
3  Q.     Okay.  And did you have any cash on you
4  when you came into the United States?
5  A.     I don't remember.  Maybe some money, but --
6  Q.     But you don't use -- because in Turkey, you
7  only use cash?
8  A.     Yeah, maybe I bring some, maybe five, three
9  or four, but not -- I know that there's a limit
10  10,000, I am so sure less than 10,000, but I don't
11  remember how much it was.
12  Yeah, I never walk without cash if you ask
13  me.  And this morning, you didn't understand the
14  cash mentality, but I'm going to give you an
15  example.  In Turkey, credit cards come so, so
16  late.  If you go somewhere, if you give a credit
17  card, you can't understand that you are not have
18  cash money.  Okay?  You are come to your life with
19  credit.  It is not a good opportunity.
20  But now after I leave, after I come here
21  and now it isn't like here, not exactly here, half
22  of the people use cash again.  Of course, to use in
23  Turkey, there is no system, you must explain your
24  cash, all your -- there is no like in going with
25  (indiscernible) you must explain your -- there is no

42 (Pages 162 to 165)

USBC, District of NJ                    In re Kamuran Cortuck, Debtor                         Monday
No. 17-34019-CMG                           Rule 341(a) Hearing                              April 30, 2018

---

### Page 166

1    system asking you how much you have.
2    Q.    Okay.  So the government can't ask you how
3    much cash you have?
4    A.    No.
5    Q.    Okay.
6    A.    And everybody use cash.  And this is so
7    normal.  Believe me, if you -- if you give a credit
8    card, they think that you don't have money and now
9    you are taking this with a credit card.  This is not
10   prestige.
11          But in your country it is different.  I
12   see.  In your country, if you pay cash, they will
13   look you, why you are paying cash.  But cannot
14   understand the difference between two countries
15   (indiscernible).
16   Q.    Okay.  Now, when you filed your amended
17   Schedule E and F, the only one you -- well, strike
18   that.
19          Was the only change to add your daughter,
20   Yisim?
21   A.    This new one?
22   Q.    When you filed the new one --
23   A.    Yeah.
24   Q.    -- were there any changes to your previous
25   one other than adding your daughter, Yisim?

### Page 167

1    A.    Only things put here, nothing more.
2    Q.    Okay.  Now, so when you filed your
3    petition, you owed Bank of America $3,111.64
4    according to your petition.  What were you using
5    that credit card for?
6    A.    You're asking -- what is that?
7    Q.    Well, it's your petition, not mine.
8          MR. CAMPBELL:  He's just -- see what
9    he's -- he's -- it's not about the document, it's
10   about something else.
11   BY MR. ATKINSON:
12   Q.    In your petition, you listed a debt to Bank
13   of America --
14   A.    Okay.  Yes.
15   Q.    -- of 3,000 --
16   A.    Yeah, yeah, yeah.  I got it yes, yes, yes.
17   Q.    -- of 3,111.64?
18   A.    Yes.
19   Q.    Okay.  That was a credit card debt,
20   correct?
21   A.    Yes, yes.
22   Q.    Okay.  Has that credit card been cancelled?
23   A.    Yes.
24   Q.    Okay.  So you haven't paid that?
25   A.    No, not yet.

### Page 168

1    Q.    Okay.  And what did you use that credit
2    card for?
3    A.    I don't -- I don't remember.  But I used my
4    personal needs, I buy maybe some stuff, I shop, I
5    don't remember, but I think you had particulars
6    about.
7    Q.    Yeah, but you're testifying.
8    A.    I don't remember, yeah.
9    Q.    You don't remember?
10   A.    Yeah.
11   Q.    Okay.  Now --
12   A.    I know only the result, the 3,000, this my
13   debt.
14   Q.    Okay.  Did you apply for the credit card
15   after you came to the United States?
16   A.    Not exactly same time, after some months --
17   Q.    Yeah.  No.  But you didn't have it before
18   you came to the United States?
19   A.    No, no, no, no.  After I come here, I did
20   it.
21   Q.    Okay.  Now, so you filed an application to
22   get a credit card?
23   A.    I think banking and we did something with
24   my son did and I signed something.
25   Q.    Okay.  And in that application, did it ask

### Page 169

1    for any of your finances?
2    A.    Maybe.  I know that we give my salary that
3    I am earning we gave, I know.
4    Q.    Do you have a copy of the credit card
5    application?
6    A.    No.
7    Q.    Do you know who would other than the credit
8    card company?
9    A.    Example.  This morning you ask another
10   bank.  I remember now.  It is Valley Bank, the old
11   bank was Valley.
12   Q.    The other bank that you had was Valley
13   National Bank?
14   A.    Yeah, Valley National Bank.  I remember
15   now.  Okay.
16   Q.    Which branch did you use?
17   A.    Near our office, South Brunswick.
18   Q.    South Brunswick?
19   A.    Yeah.  But I don't remember the branch
20   name.
21   Q.    How about the branch up in Ridgewood?
22   A.    No, no.
23   Q.    Okay.
24   A.    It's a small branch near our office.
25   Q.    Okay.  Now, getting back to the question I

---

43 (Pages 166 to 169)

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

## Page 170

1  was asking --
2  A.    Yeah.
3  Q.    -- do you have a copy of your application
4  for the credit card?
5  A.    No.
6  Q.    Would Sirkan have a copy of the
7  application?
8  A.    Maybe, maybe.  I don't have because all the
9  things he's done for me.
10  Q.    But you signed the application?
11  A.    Yeah, yeah, yeah, yeah, yeah.
12  Q.    Would you ask Sirkan if he has a copy?
13  A.    Okay.  I will ask him.
14        MR. CAMPBELL:  I got it.
15  Q.    If he has a copy, get it to me.  Okay?
16        Did you use the credit card for oversea
17  travel?
18  A.    I -- I don't remember, but maybe -- I use
19  some maybe in Switzerland, I think.
20  Q.    In Switzerland?
21  A.    Yeah, I think, yes.  Or hotel expenses, I
22  don't -- yeah, I think, yes.
23  Q.    Now, you've also listed a Capital One
24  platinum MasterCard with a balance of 1,155.29?
25  A.    Yes.

## Page 171

1  Q.    What was that card used for?
2  A.    I'm using -- I'm using that card also daily
3  uses.  This is -- the amount of credit is small,
4  like a thousand or 2,000 or 3,000.
5  Q.    I hope it wasn't a thousand because you owe
6  more than a thousand.  Do you know what the -- do
7  you know what your credit card limit was with
8  Capital One?
9  A.    No, no.  First, it was so small, then it
10  increased, but I do not know what is the maximum.
11  Q.    Do you know what your credit card limit was
12  with Bank of America?
13  A.    I think it is 10 or 15.  I -- they begin
14  with a small limit, it's interesting, they increase
15  it.  But I know that at the beginning, example, Bank
16  Capital was only a thousand, a little or something
17  at the beginning, but then I begin to work, they
18  increase it, but at then I don't know what was
19  amount, maybe 3,000, 4,000, 5,000.
20        And Bank of America, I begin maybe 3,000,
21  4,000, maybe then they increase up to 10 or 15
22  something.
23  Q.    Okay.
24  A.    I don't remember --
25  Q.    Okay.

## Page 172

1  A.    -- what was the case.
2  Q.    Now, you've also listed as a creditor
3  Rowena Ventures, LTD.
4  A.    Umm-hmm.
5  Q.    And you've listed that as disputed.  So
6  what does Rowena Ventures say you owe to it?
7  A.    I don't remember why we put Rowena
8  Ventures.  It's a company which bills my daughter.
9        MR. CAMPBELL:  If you don't know, you
10  don't know.
11  A.    No, I don't know.
12  Q.    Well, did you give the list of potential
13  creditors to Mr. Campbell?
14  A.    Yeah, we give -- we discussed what
15  companies can and we put it like this.
16  Q.    Okay.  And that one you said is disputed?
17  A.    Yeah.
18  Q.    Okay.  Now, you just mentioned that's a
19  company that's owned by your daughter.
20  A.    Yeah, as I know, yeah.
21  Q.    Okay.  You used to be the owner of that
22  company; is that correct?
23  A.    Yeah, in 2004 or '5, I established that
24  company but, then I transfer my shares to my
25  daughter.

## Page 173

1  Q.    And what was the purpose of that company?
2  A.    Well, that company's working with Romania.
3  There are some properties there, that company's
4  partner of those institutes there and they are
5  working there in Romania.  Some companies owned by
6  Rowena in Romania.
7  Q.    Does Rowena still own companies in Romania?
8  A.    I don't know.  I only know that situation
9  up to 2006 or '7, I left the company.  I don't know
10  today what's going on.
11  Q.    Other than owning some company -- I'm
12  sorry.
13        Did it own companies in Romania or did it
14  own properties in Romania?
15  A.    I don't know because after 2007, I don't
16  know what they did.
17  Q.    No, I'm talking about when you were the
18  owner.
19  A.    Oh, I was there -- when I was there,
20  Rowena -- Rowena, is, yeah, property companies in
21  Romania, apartment.  After that I don't know what
22  else.
23  Q.    And those companies in Romania owned land
24  or buildings?
25  A.    Owned land, not buildings.  I think only

44 (Pages 170 to 173)

USBC, District of NJ                    In re Kamuran Cortuck, Debtor                    Monday
No. 17-34019-CMG                        Rule 341(a) Hearing                              April 30, 2018

|  | Page 174 |
|---|---|

1   land. At that time, they have -- they have only
2   land.
3   Q.      Okay. And you believe you transferred that
4   property -- excuse me -- you transferred Rowena to
5   your daughter, Yisim in 2006 or 2007?
6   A.      I don't remember, but must be like that
7   something.
8   Q.      Okay.
9   A.      Before 2009, but I don't know when.
10  Q.      And what did your daughter give you for
11  that company?
12  A.      Oh, he only -- he only -- I don't have time
13  to manage those companies. I gave him that company
14  and ask him to manage it. And as the owner, he
15  tried to manage it. And some of the benefits from
16  that company for the future benefits, we also used
17  together because while he's taking those, he didn't
18  pay anything. He gave shares in to manage and to
19  work on it and to operate it.
20  Q.      What percentage of Rowena did you own?
21  A.      At that time, as I remember, I'm not so
22  sure, but it must be 25 percent or 50 percent. I
23  don't know which one.
24  Q.      Who were the other owners of Rowena?
25  A.      One of my partner in Bayindir Insaat.

|  | Page 175 |
|---|---|

1   Q.      And which partner?
2   A.      One of my partner.
3   Q.      I know. But who?
4   A.      His name?
5   Q.      What was his name?
6   A.      Abdullah.
7   Q.      Abdullah?
8   A.      Yeah.
9   Q.      A-B-D-U-L-L-A-H?
10  A.      H, yeah.
11  Q.      Okay. His last name?
12  A.      C-O-B-A-N, Coban.
13  Q.      Like the yogurt? Cobani yogurt?
14  A.      Yeah, Cobani is a very famous last name in
15  Turkey.
16  Q.      Okay. What percentage did Abdullah Coban
17  hold?
18  A.      I don't remember.
19  Q.      And who were the other partners?
20  A.      My son.
21  Q.      That would be Sirkan?
22  A.      Yes.
23  Q.      And what percentage does Sirkan own?
24  A.      I don't remember all those percentage.
25  Also my 95 or (indiscernible). I don't remember the

|  | Page 176 |
|---|---|

1   exact.
2   Q.      Pardon me?
3   A.      I don't remember my side, my percentage.
4   Maybe 25, maybe 50.
5   Q.      Okay.
6   A.      But I know that the other two more
7   partners, I don't remember exactly what is their
8   percentage.
9   Q.      Who were the other two partners?
10  A.      I said one of them's Abdullah, the other
11  one's Sirkan.
12  Q.      Oh, those were the only other two partners?
13  A.      Only them.
14  Q.      Okay. I apologize.
15          I thought you said two other -- additional
16  partners?
17  A.      We had three partners.
18  Q.      Okay.
19  A.      I left.
20  Q.      And when you left, what was the value of
21  the assets of Rowena?
22  A.      I don't remember, but there is land. At
23  that time, Rowena buys some shares from that company
24  because that company's not -- does not belong to
25  Rowena.

|  | Page 177 |
|---|---|

1   Q.      What company was that?
2   A.      Bayindir Insaat bought the property, a
3   Romanian company that bought it while I was partner
4   of Rowena.
5   Q.      Okay.
6   A.      The land belongs, the land belongs Bayindir
7   Insaat --
8   Q.      Okay.
9   A.      -- and the Romanian governmental company.
10  Q.      Okay.
11  A.      Then while I was partner, while I -- Rowena
12  bought Bayindir Insaat shares. Okay?
13  Q.      Okay.
14  A.      I am not so sure, but the amount was, the
15  amount was as I remember -- I remember because of
16  Swiss case because it was open. If you have a
17  chance to read Swiss case, everything is dated and
18  everything is written there.
19  Q.      Okay.
20  A.      If you need, we can ask our lawyers
21  (indiscernible) they can't send me everything,
22  everything is like that. But as I remember from two
23  or three years ago, at that time, the shares are --
24  the Rowena shares what they bought is less than
25  $500,000.

45 (Pages 174 to 177)

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

## Page 178

1  Q.   Yeah.  But how much did they pay Bayindir
2  Insaat for the shares?
3  A.   For, I am saying that, less than 500,000.
4  I don't remember exactly the amount.
5  Q.   Okay.
6  A.   Then Rowena become shareholder and after
7  that, I left from the company.
8  Q.   Okay.  And just so that I'm clear, your
9  daughter didn't pay anything for your shares?
10  A.   She didn't pay, she take my percentages,
11  okay, but from the income from the land in the
12  future, if there's an income from the land, he will
13  support Bayindir Insaat.  She promised to support
14  Bayindir Insaat because the shares belongs to
15  Bayindir Insaat.  Do you understand?  This is not my
16  shares.
17       When I partner Rowena, is a simple company
18  without anything.  Okay?  A company established, not
19  no assets inside.  Okay.  Before I left,
20  Rowena assets bought the Bayindir Insaat -- Rowena
21  has only shares of -- shares of land in Romanian
22  company.
23  Q.   And where is Rowena -- is it corporation or
24  is it a limited liability company?
25  A.   Limited liability company, which is managed

## Page 179

1  by NWT.  Which is managed by NWT.
2  Q.   NWT?
3  A.   Yeah.
4  Q.   Okay.  And subsequently, was it managed by
5  Dominion?
6  A.   Before that, my time, Dominion is not
7  managed those companies.
8  Q.   Right.
9       Does Dominion manage it now?
10  A.   I don't know.  But at my time, NWT managed
11  this company.
12  Q.   Okay.  Now, where was Rowena formed, in
13  what country?
14  A.   I think one of the islands maybe because of
15  tax reasons, I don't remember which one.
16  (Indiscernible).  But one of those islands.  It must
17  be like that.
18  Q.   An island in the Caribbean or the island in
19  the Mediterranean --
20  A.   I don't know which one.
21  Q.   -- or in the Pacific?
22  A.   Maybe Pacific.  I don't remember which one.
23  Q.   And how many years were you involved with
24  Rowena?
25  A.   I think -- I don't remember exactly, but I

## Page 180

1  left from the company 2007-2008, but I am so sure
2  before 2009.
3  Q.   Okay.
4  A.   I don't remember exactly the date.  But I
5  left from the company, latest 2009.
6  Q.   Okay.  And when did you start the company?
7  A.   2004 or 2005 or something.
8  Q.   Do you have any of your financial records
9  from Rowena when you were involved with Rowena?
10  A.   No.
11  Q.   Did Rowena invest in anything other than
12  the one company that had some land in Switzerland --
13  excuse me -- in Romania?
14  A.   My time, there is only Romania company, my
15  time.  After that, I don't know.
16  Q.   Did Rowena earn any income during your
17  time?
18  A.   I don't know.  I don't remember.  If there
19  is income, I didn't take an income.  I can't say
20  that I didn't take and share.  I can't say that I
21  didn't take any money from source of Rowena
22  personally.
23  Q.   Now, in connection with the Swiss criminal
24  investigation and the payment that ultimately came
25  about, did you say in Switzerland that you were the

## Page 181

1  owner of Rowena?
2  A.   At the time of discussion with prosecutor,
3  it takes maybe five or six times, or five times,
4  those are long meetings like this.  Okay?  Maybe at
5  that time, maybe I -- I might say that.  I am the
6  owner of Rowena because at the beginning, I am the
7  owner of Rowena.  Maybe it can be misunderstood or
8  it can be another way, but I don't know.  But the
9  thing that I want to say, at the beginning
10  company was, I was a shareholder of the company.
11  Okay?
12       That date when he asked me at the time I
13  was not partner of Rowena.  If something's written
14  there, it could be a misunderstanding or something
15  wrong.  I don't -- I don't know what they wrote
16  there, but if there's something -- I want to say
17  that I was partner of Rowena until, I don't
18  remember, 2007, '8, '9, something.  Okay?
19  Q.   Okay.
20  A.   At the time, I was not partner and I didn't
21  say that I am partner.
22  Q.   Now, as part of your settlement of the
23  Swiss criminal proceeding, did Rowena contribute any
24  money to that settlement?
25  A.   I don't remember exactly how -- how much

46 (Pages 178 to 181)

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

## Page 182

1  money comes from or I only know that my life
2  insurance is gone and some of the companies have
3  some money, but I don't remember if Rowena has money
4  or not.
5  Q.   Did any money go from Tempest as part of
6  that settlement?
7  A.   Tempest maybe, yeah, but I don't remember
8  that much. Tempest has some money, but if you ask
9  me amount, I don't know.
10  Q.   Now, in both the petition, the original
11  Schedule E/F and in the amended Schedule E/F you've
12  listed Westpoint Industries, LTD as a creditor
13  unknown and disputed.
14  A.   Yes.
15  Q.   Why have you listed Westpoint Industries,
16  LTD?
17  A.   I don't have any relation with Westpoint
18  Industry.
19  Q.   Okay. So then why have you listed them as
20  a potential creditor that is disputed or a creditor
21  that is disputed?
22  A.   I said unknown. I think if I know
23  something, I must write it that that is
24  (indiscernible).
25  Q.   Well, has Westpoint Industries, LTD ever

## Page 183

1  made a claim against you?
2  A.   Not yet, until now I think. Did I have
3  anything say something --
4       MR. CAMPBELL:   You just answer what
5  you know.
6  A.   No, I don't remember. I don't know.
7  Q.   So do you contend that you do not owe
8  anything to Westpoint Industries --
9  A.   Yes.
10  Q.   -- LTD?
11  A.   Yes, yes.
12  Q.   Okay. And now -- and that was the end of
13  the creditor's in the original petition.
14       Now you've listed Yisim Sakarya, your
15  daughter as a creditor for 29,656. And you put her
16  address as 5 Spy Glass Court, Monroe Township, New
17  Jersey. She actually lives in Turkey though; is
18  that correct?
19  A.   Yeah, yeah.
20  Q.   And how did you come up with the figure
21  29,656?
22  A.   Okay. As I told you this morning, before
23  Swiss money she's given to me, I ask her what is my
24  debt to you because I know that she paid a lot of
25  money to my lawyers. And at that time, we worked

## Page 184

1  together, he was here, he entered the computer and
2  he checked it and he find a number. Okay? It was
3  250 something or 60 something after that.
4  Q.   Okay.
5  A.   And but in UK case, in UK case, he's also a
6  part related with that case, while she's working to
7  give them documents in the UK case, she checked
8  again what she paid --
9  Q.   Okay.
10  A.   -- lawyers. When she checked with me, with
11  computer, the system only gives two years back, the
12  Turkish banking system.
13  Q.   Okay.
14  A.   You enter it, you can only see on two
15  years. Okay? But she ask documents from that bank
16  for UK case, he saw that, she spent this amount more
17  because of two years, more than two years, okay, two
18  years two months. Then she told me that --
19  Q.   Okay.
20  A.   -- father, I spend more and I see the
21  documents that she spent more and I put in this.
22  The difference is we learned later on, then she
23  prepared herself to UK case.
24  Q.   Okay. Now, when she said father, I've
25  discovered this additional, did she provide you --

## Page 185

1  A.   Yeah, I saw the document.
2  Q.   You saw the document?
3  A.   Yes.
4  Q.   Where did you see it?
5  A.   I think she was -- when she was here, she
6  was here one month ago she was here and at that time
7  she told me that she made something wrong.
8  Q.   Okay. Did you make a copy of it?
9  A.   No.
10       MR. CAMPBELL:   We can get you copies.
11  A.   If you want, we can, yes.
12  Q.   I'm going to ask for a copy of the proof --
13  A.   Yes, yes.
14  Q.   -- of what Yisim paid on your behalf.
15  A.   Additional.
16  Q.   No, the whole 200 --
17       MR. CAMPBELL:   Yeah.
18  Q.   -- 80,000, 300,000, whatever the number is.
19  A.   Okay. She had bank records.
20  Q.   And were these all for attorney fees?
21  A.   Attorney fees and also I think a part for
22  Dominion because --
23  Q.   A part for Dominion?
24  A.   Dominion, yes.
25  Q.   Why was she paying your Dominion bills?

47 (Pages 182 to 185)

USBC, District of NJ                In re Kamuran Cortuck, Debtor                Monday
No. 17-34019-CMG                    Rule 341(a) Hearing                         April 30, 2018

---

**Page 186**

1    A.    Because Dominion at the time of prosecutor
2    agreement, after prosecutors blocked every account,
3    prosecutor doesn't allow to pay them their monthly
4    expenses.
5    Q.    Okay.
6    A.    Then Dominion paid it, okay, because of
7    that decision. But at the time of settlement, we
8    need them, we need their support and they said that
9    we cannot help you because you're not paying us.
10   Q.    Umm-hmm.
11   A.    I ask my daughter to pay also that amount
12   to finalize the settlement.
13   Q.    Did she pay it from her personal account?
14   A.    Yes. Also, we can also give that document
15   to you, bank record.
16         MR. ABRAMOWITZ:  What document is
17   that?
18         MR. ATKINSON:  Is that the document
19   where she transferred the money to Dominion?
20         THE WITNESS:  Yes, from the bank, her
21   bank personally.
22   BY MR. ATKINSON:
23   Q.    From her personal bank?
24   A.    Yes.
25   Q.    Is her personal bank located in Turkey or

---

**Page 187**

1    is it in Switzerland?
2    A.    In Turkey.
3    Q.    Okay. So you'll provide me with that.
4    Now, did Yisim go to college, university?
5    A.    Yes.
6    Q.    Okay. And what's her profession?
7    A.    She finished -- she finished management
8    school in university, then she come LA, Los Angeles
9    and she stayed there two years for participation
10   program or something, she stayed in Los Angeles two
11   years.
12   Q.    And how long ago was that?
13   A.    How long ago? Oh.
14   Q.    I mean, are we talking like the year -- she
15   was born I believe you said in 1977?
16   A.    '77, 20 years full university, 1999, after
17   university she come, 2000 or two -- 2000 maybe.
18   Q.    Okay. So --
19   A.    After the university.
20   Q.    About 17 years ago?
21   A.    Yeah, after university she come and stayed.
22   Q.    Okay. And then she went back to Turkey?
23   A.    Yes.
24   Q.    Okay. And did she get a job?
25   A.    Yes, she worked with our holding.

---

**Page 188**

1    Q.    She worked with what?
2    A.    With our holding company.
3    Q.    Bayindir Holdings?
4    A.    Yeah, yeah, which she worked, yes.
5    Q.    And what did she do at Bayindir Holdings?
6    A.    She's working for human resources
7    department and also some new projects they're
8    working with. He has two title. At the beginning,
9    he worked at human resources, then she worked for
10   new projects.
11   Q.    Okay. So human resources and new projects?
12   A.    Yeah, at the beginning, yes.
13   Q.    And did she have a salary?
14   A.    Yes.
15   Q.    What was her salary?
16   A.    I don't know. I don't remember.
17   Q.    Well, did you get her the job?
18   A.    She -- she worked and she earned money.
19   Q.    No, no. I'm saying, you know, you owned a
20   substantial portion of Bayindir --
21   A.    Yes.
22   Q.    -- Insaat --
23   A.    Yes.
24   Q.    -- which had -- was under the umbrella of
25   Bayindir Holdings.

---

**Page 189**

1    A.    Yes.
2    Q.    Correct?
3          Was it just coincidence that she became
4    employed at Bayindir Holdings or did you say Yisim,
5    I can get you a job at Bayindir Holdings?
6    A.    As a proficient at the university, what she
7    graduated with the university and she worked two
8    years in Los Angeles. In Turkey, it is not easy to
9    find qualified people.
10   Q.    Right.
11   A.    Yeah. And she's -- she's one of the
12   workers that we need. We ask him to work with us.
13   Q.    Okay. That's all I was asking.
14   A.    Okay.
15   Q.    So you asked Yisim to work for you?
16   A.    Yeah, for us.
17   Q.    Work for us, which I'm assuming is --
18   A.    Yes, the companies.
19   Q.    -- for the companies? Okay.
20   A.    Not for me.
21   Q.    But you don't know how much she was paid?
22   A.    I don't know.
23   Q.    Now, when Yisim started working for
24   Bayindir -- I'm sorry.
25         MR. CAMPBELL:  No, not me.

---

48 (Pages 186 to 189)

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

## Page 190

1   MR. ATKINSON: There's no one. It's a
2   ghost.
3   Q.   When Yisim started working for Bayindir
4   Holdings.
5   A.   Yes.
6   Q.   Did she own a home?
7   A.   I don't remember. Maybe.
8        MR. CAMPBELL: Well, can we give a --
9   what year are we talking about here?
10       MR. ATKINSON: Well, he thinks about
11  2001.
12       MR. CAMPBELL: We're asking about his
13  daughter's house in 2001?
14       MR. ATKINSON: I am, I am.
15  A.   Maybe 2001.
16       MR. CAMPBELL: Can I ask why that's
17  relevant to the debtors?
18       MR. ATKINSON: We'll get there.
19       MR. CAMPBELL: Okay.
20  BY MR. ATKINSON:
21  Q.   Now, are you aware of whether or not Yisim
22  has an interest in any company other than Rowena?
23  A.   Under the Rowena, there is Westpoint.
24  She's also carrying Westpoint as far as I know.
25  Q.   That would be Westpoint UK?

## Page 191

1   A.   Yes, because Westpoint is -- UK is a part
2   of Rowena. When she becomes owner of Rowena,
3   normally she must also --
4   Q.   Okay. So does Rowena own Westpoint UK?
5   A.   Rowena owns Westpoint UK, yes.
6   Q.   Does it own a hundred percent of --
7   A.   I don't know. At -- at my time, I think,
8   yes, Rowena -- I think at my time, Westpoint is a
9   part of Rowena, but I don't know shares.
10  Q.   And what does Westpoint UK do?
11  A.   We -- in reality, they are also supporting
12  Rowena in some basis for the Romania case, Romania
13  land case and other things as I know, but sometimes,
14  she also works, she also use Westpoint for her
15  purposes.
16       Example, I think she begin to work with us
17  2000 or something and she worked with us for five
18  years. Then she married and she left from company.
19  Q.   When did she leave the company?
20  A.   2000 -- I don't know exactly. She worked
21  for six or seven years. I don't know. But I know
22  that she left from us before 2001. I don't know
23  exactly what date, but she left from us because she
24  married and she left from the company and she only
25  carried this company, she's only carrying this. She

## Page 192

1   left from the holding.
2   Q.   She left the holding company when she
3   got --
4   A.   Yeah. And she didn't work with us.
5   Q.   When she got married?
6   A.   Yeah.
7   Q.   Okay. From the time she left the holding
8   company when she got married until the time she --
9   you transferred your interest in Rowena to her,
10  where did she work?
11  A.   Again, because I don't understand.
12  Q.   From the time --
13  A.   Yeah. She left.
14  Q.   -- she left the holding company --
15  A.   Yes.
16  Q.   -- to the time you transferred your
17  interest in Rowena to her, where did she --
18  A.   2003 or 2004.
19  Q.   Where did she work?
20  A.   She's working with Bayindir.
21  Q.   No.
22       Okay. She -- she's working for Bayindir
23  Holding, correct?
24  A.   Yes. Until 2006 or 2009 or something.
25  Q.   She gets married?

## Page 193

1   A.   Yes.
2   Q.   And then leaves Bayindir Holding?
3   A.   Yes.
4   Q.   Was she still working for Bayindir Holding?
5   A.   No, no.
6   Q.   Wait.
7        Was she still working for Bayindir Holding
8   when you transferred your interest to her in Rowena?
9   A.   Then I transfer my share to her --
10  Q.   Yep.
11  A.   -- she was working for Bayindir Holding.
12  Q.   Okay. So she was still working there,
13  right?
14  A.   Until she marry and left.
15  Q.   Okay. Do you know when she got married?
16  A.   I don't remember. No, no. I did not --
17  maybe because uncommon to you, but believe me, my
18  life is so complicated if I tried to remember
19  everything I cannot remember. Okay?
20  Q.   Okay.
21  A.   But really, I don't remember. I don't
22  remember. I know that she has a daughter now seven
23  years old. Let us make a calculation, go back one
24  years, okay, eight years, go back, 2008, 2009 or
25  2007.

49 (Pages 190 to 193)

USBC, District of NJ                    In re Kamuran Cortuck, Debtor                    Monday
No. 17-34019-CMG                         Rule 341(a) Hearing                    April 30, 2018

## Page 194

1  Q.      Okay.
2  A.      For that reason, I don't know exactly when
3  she left.
4  Q.      Okay.
5  A.      Believe me, I didn't remember those things.
6  I am not --
7  Q.      And apparently, you have a good
8  relationship with your daughter?
9  A.      Yes.
10 Q.      Okay.  And after she left Bayindir
11 Holdings --
12 A.      Yes.
13 Q.      -- who did she work for?
14 A.      She worked with his husband.  His husband
15 is also -- she husband has some new project that
16 will open a company in Ankara.  She's working in
17 (indiscernible) companies.  She's working with the
18 (indiscernible) permission (indiscernible).  She had
19 (indiscernible).  They worked together I mean.
20 Q.      Okay.  She and her husband worked
21 together --
22 A.      Together.
23 Q.      -- at her husband's company in Ankara?
24 A.      Yeah.
25 Q.      Okay.  Now, getting back to Rowena and

## Page 195

1  Westpoint UK, what does Westpoint UK do?
2  A.      This is not -- I cannot answer this because
3  after I left, I don't know what they did exactly.
4  Okay?
5  Q.      Yeah.
6  A.      I don't know.  They did something.  But
7  only I know, only what I know is she did the
8  personal thing, a good job, okay, with help of his
9  husband and with relation they made a good sale
10 of -- sales of one company and she made enough money
11 that I know.
12 Q.      Okay.
13 A.      But other things what she did, I don't know
14 with that company.
15 Q.      So your daughter earned a lot of money from
16 sales of --
17 A.      Yes.
18 Q.      -- one company?
19      Now, did Rowena buy Westpoint UK or did it
20 just form Westpoint UK?
21 A.      I don't know.  I don't remember.  Maybe
22 buy, maybe form, maybe then be take over and it may
23 be (indiscernible).  I don't remember exactly
24 because in Switzerland, if you ask a company from
25 those companies who manage, they give you a company,

## Page 196

1  and sometimes they said that there's another company
2  here under.  I don't remember.  We take it together
3  or I don't know, maybe after Rowena, we bought,
4  maybe they established Westpoint.  I don't know.  I
5  don't remember.  And I am not so sure at my time
6  Westpoint is inside of Rowena or not.  It can be,
7  but I don't remember exactly.
8  Q.      Okay.  In your time, was Rowena earning any
9  income?
10 A.      Yeah, my time, Rowena, Rowena doesn't earn
11 anything.  They only buy shares of Romania company
12 shares, but after that, they earn money, I know.
13 Q.      Okay.  Okay.  So when you were there, they
14 were earning money?
15 A.      After I left, they earned money.
16 Q.      Okay.  Before you left, were they earning
17 money?
18 A.      No, they don't earn money.  This is only an
19 empty company.
20 Q.      Okay.
21 A.      They (indiscernible) in what they did, they
22 buy the shares of Bayindir Insaat as I told you --
23 Q.      Yeah.
24 A.      -- in Romanian company, at the time I was
25 there, and as I remember, they paid, Rowena paid

## Page 197

1  less than half million dollars for the shares of
2  Bayindir Insaat, that is what I know.
3  Q.      Okay.  And no one would know better than
4  you because you were the owner of Rowena, correct?
5  A.      Yes.  But, Mr. Trustee, if you ask me 42
6  companies detail, I say I can only remember a
7  company about that.
8  Q.      I can only ask you one.
9  A.      You can also understand me.
10 Q.      Well, where did Rowena get the $500,000 to
11 pay Bayindir?
12 A.      I don't remember.  But if -- it can be
13 known.  Let us make it easy, Mr. Trustee.  Let us
14 ask all the details from prosecutor document.  We
15 can see everything inside.  I didn't remember.  But
16 everything is there.  It's not -- nothing's secret.
17 You can see everything there.
18 Q.      Okay.  So you'll give me an authorization
19 to have all of the documents from the prosecutor?
20 A.      You can ask.  I can give you permission.
21 Everything is clear and you can see everything
22 there.  The things that I remember, it is not there.
23 Okay.  I'm so sure.
24 Q.      You're sure what?
25 A.      I am sure that all the questions that you

50 (Pages 194 to 197)

USBC, District of NJ                In re Kamuran Cortuck, Debtor                Monday
No. 17-34019-CMG                        Rule 341(a) Hearing                  April 30, 2018

---

Page 198

1  ask me detail and their (indiscernible) it is in
2  there, but (indiscernible), believe me, I didn't
3  type anything.
4      Q.    Okay.  Now, when you formed Tempest, did
5  you ever put any money into Tempest?
6      A.    I think no, it's an empty company, shell
7  company.
8      Q.    Okay.  Now --
9          MR. CAMPBELL:  Could we take a
10 bathroom break?
11         MR. ATKINSON:  Absolutely.
12         MR. CAMPBELL:  Yeah.  Thank you.
13         MR. ATKINSON:  It's 2:52.  Why don't
14 we come back at five after 3:00?  Give the reporter
15 a break.
16         (Recess taken.)
17         MR. ATKINSON:  Okay.  We're all back
18 from all breaks.  There we go.
19         I now am continuing with the first meeting
20 of creditors of Mr. Cortuk.  We've come back from
21 our short break.  It is now three o'clock.
22 BY MR. ATKINSON:
23     Q.    And I apologize if I already asked this,
24 but I'll ask you again because I had you identify
25 the signatures on the original petition.  I don't

---

Page 199

1  know whether I had you identify your signatures --
2          MR. CAMPBELL:  Yeah.
3      Q.    -- on the amendment.  I don't think I did.
4          MR. CAMPBELL:  Yeah.
5      Q.    So, Mr. Cortuk, we're going to show you
6  your signature.
7          No, you've already signed it.  No, you've
8  already signed it?
9          MR. CAMPBELL:  No, you already signed
10 it.  Is that your signature?
11     A.    Yes, my signature.
12     Q.    Is that your signature?
13         And did you read the amendment before you
14 filed it?
15     A.    Yes.
16     Q.    Okay.  And you also filed an Amended
17 Statement of Financial Affairs on April 27, 2018.
18 I'm going to ask you in a second whether that --
19 this is your signature.
20         And is that your signature?
21     A.    My signature.
22     Q.    And is the information contained in the
23 Amended Statement of Financial Affairs true?
24     A.    Yes.
25     Q.    Okay.  And you read it before you signed

---

Page 200

1  it?
2      A.    Yes.
3      Q.    Okay.  And you also filed an amended
4  declaration concerning your schedules?
5          MR. CAMPBELL:  Yeah, that's what we --
6  yeah, that one we signed.  Here it is.
7          MR. ATKINSON:  Yeah.
8      Q.    I'm just going to ask, did you sign that?
9      A.    Yes, I signed it.
10     Q.    Okay.  Now, getting back to your -- I'm
11 trying to think exactly where we left off.  I
12 apologize.  I think we were talking about Westpoint
13 UK.
14         Now, Westpoint UK has an interest in some
15 companies I think you said that has some land in
16 Romania?
17     A.    Rowena has land in Romania, not Westpoint.
18     Q.    Okay.  Do you know what Westpoint UK owns?
19     A.    I don't know.
20     Q.    Okay.  You work for Iron Bridge, correct?
21     A.    Yes.
22     Q.    Okay.  And does Westpoint USA own Iron
23 Bridge?
24     A.    I -- they have a small percent
25 shareholders, yeah.

---

Page 201

1      Q.    Okay.  And do they still have a shareholder
2  interest?
3      A.    I don't know.
4      Q.    And is Westpoint USA owned by Westpoint UK?
5      A.    I don't know.
6      Q.    You never heard that in the four years you
7  were working there?
8      A.    Yeah, yeah, yeah.  I know that there is an
9  English companies.
10     Q.    My apologies.  You were not working there
11 four years, you were only working there about three
12 years.
13     A.    37 months.
14     Q.    Okay.
15     A.    More than three years.
16     Q.    That's why I said I apologize for saying
17 four years.  You weren't there four years?
18     A.    No.
19     Q.    Okay.  So during the 37 months, did you
20 become aware that Westpoint USA was owned by
21 Westpoint UK?
22     A.    Yeah, I know because my son represented
23 them.  Because of that, I know the linkage.
24     Q.    Okay.  And do you know who the officers
25 are --

---

51 (Pages 198 to 201)

USBC, District of NJ
No. 17-34019-CMG

In re Kamuran Cortuck, Debtor
Rule 341(a) Hearing

Monday
April 30, 2018

### Page 202

1    A.    No.
2    Q.    -- of Westpoint USA?
3    A.    Westpoint USA?
4    Q.    Yeah.
5    A.    I don't know officers, but my son represent
6    them.  I know that.
7    Q.    Did you ever --
8    A.    I don't know officers, who maybe there are
9    somebody, but I only know that my son represent
10   them.
11   Q.    Okay.  Do you know why Westpoint USA was
12   created?
13   A.    No.
14   Q.    Did anyone ever tell you that it was
15   created for tax reasons?
16   A.    No.  I don't know.  I didn't.
17   Q.    Do you know what Westpoint USA may own
18   other than an interest in Iron Bridge?
19   A.    I know that only there are shareholders of
20   the company.
21   Q.    Okay.  Does Iron Bridge owe Westpoint USA
22   any money?
23   A.    Sorry?
24   Q.    Do you know whether Iron Bridge owes --
25   A.    I don't know.  I don't know

### Page 203

1    (indiscernible).
2    Q.    Okay.  Now, getting back to your Statement
3    of Financial Affairs, I think I was just about to
4    start that.  I think the only place -- well, you're
5    not married; is that correct?
6    A.    I'm divorced.
7    Q.    You're divorced?
8    A.    Umm-hmm.
9    Q.    Okay.  And calling your attention to the
10   Statement of Financial -- original Statement of
11   Financial Affairs, Part 2, question number 4, you
12   were asked for your income during the year, that
13   would be 2017 and the two previous calendar years.
14        MR. CAMPBELL:  Let me just get to the
15   Statement of Financial Affairs.  The original one?
16        MR. ATKINSON:  Yeah.
17        MR. CAMPBELL:  Sorry, where are you?
18        MR. ATKINSON:  We're on page 1 of the
19   Statement of Financial Affairs, question number 4.
20   BY MR. ATKINSON:
21   Q.    And you earned in 2016 $120,000; is that
22   correct?
23   A.    Yes.
24   Q.    Okay.  And was that all earned from working
25   at Iron Bridge?

### Page 204

1    A.    Yes.
2    Q.    And in 2015, you made $120,000, and was
3    that also from your income at Iron Bridge?
4    A.    Yes.
5    Q.    And in 2014, you earned $70,000 and that
6    was from Iron Bridge?
7    A.    Yes.
8    Q.    Okay.  And you did not list what you earned
9    in 2017.  Did you earn money in 2017?
10   A.    After Iron Bridge, I didn't earn any money.
11   Q.    No.  But you worked at Iron Bridge you said
12   from -- until June of 2017.
13   A.    Yes.
14   Q.    Did you earn any money at Iron Bridge?
15   A.    In 2017, I earned some money.
16        MR. CAMPBELL:  Yeah, it's not here
17   though.  That's what he's saying.
18   A.    Yes, I earn -- I took seven months, six or
19   seven months' salary.
20   Q.    Okay.  Was that $10,000 a month?
21   A.    Yeah.
22   Q.    Okay.
23   A.    Six or seven.
24   Q.    Okay.  Okay.  So you left either in June or
25   July?

### Page 205

1    A.    Yeah.
2    Q.    All right.  And when you filed the Amended
3    Statement of Financial Affairs, you did not include
4    your 2017 income, correct?
5        MR. CAMPBELL:  That was my mistake.  I
6    didn't --
7    A.    We gave I think, yeah.
8    Q.    Okay.  Now, calling your attention to
9    page 2, did you receive -- did you receive any other
10   income during the year or the two previous calendar
11   years, and you've said no?
12   A.    No.
13   Q.    Okay.  And in your Amended Statement of
14   Financial Affairs, you've also said no; is that
15   correct?
16   A.    Yes.
17   Q.    Okay.  So other than your income that you
18   received from Iron Bridge, you didn't receive any
19   other income?
20   A.    No.
21   Q.    Okay.  Did you receive any gifts?
22   A.    No.
23   Q.    And you said your debts are not primarily
24   consumer debts.
25        Other than the bank in Romania, Banca Turco

52 (Pages 202 to 205)